KINGSTON TRAP ROCK Co., a body corporate, and KINGSTON BITUMINOUS PRODUCTS Co., likewise a body corporate, et al., complainants-respondents,

*v.*

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL No. 825, 825-A and 825-B, and INTERNATIONAL LABORERS' UNION, LOCAL No. 472, et al., defendants-appellants.

[Argued October 22d, 1940. Decided April 25th, 1941.]

Mr. *John E. Toolan,* for the appellants.

Mr. *Samuel Koestler* and Mr. *Melvin J. Koestler,* for the respondents.

The opinion of the court was delivered by

HEHER, J.

The judicial action challenged is an order imposing upon the appellant labor unions and certain of their agents restraints *pendente lite* in these particulars:

"(a) From inducing or attempting to induce Anthony P. Miller, Inc., Harry T. Campbell Sons Co. and other customers of the complainant Kingston Trap Rock Co. to cease dealing with said complainant by threat of violence, strike or boycott as against them or any of them;

"(b) From refusing to furnish union workers who are members of said Unions or any of them to the said Anthony P. Miller, Inc., or Harry T. Campbell Sons Co. or other customers of the complainant Kingston Trap Rock Co. unless

they or any of them shall purchase their supplies and materials from sources other than Kingston Trap Rock Co.;

"(c) From entering into any agreement or conspiracy to withhold the furnishing of union workers who are members of said Unions, or either of them, or any other Union to any person, firm or corporation who may purchase or receive its supplies or materials from the complainant Kingston Trap Rock Co.;

"(d) From inducing or attempting to induce or agreeing or conspiring with any labor union or other organization of laborers or employes for the purpose and with the intent of having their members refrain from or refuse to work for persons, firms or corporations who may buy their supplies or materials from the Kingston Trap Rock Co. or use materials or supplies furnished by said Kingston Trap Rock Co."

Two bills of complaint were filed herein. Under the original bill, the appellant unions and certain of their representatives were enjoined from the employment of "force, violence, threats, or intimidation" in the prosecution of a strike of respondents' employes. There was no appeal from the order thus made. Subsequently, respondents filed a supplemental bill alleging, *inter alia,* that on or about March 27th, 1940, the Kingston Trap Rock Co. entered into a contract with Anthony P. Miller, Inc., to furnish stone ballast required by the latter for the performance of a contract with the Pennsylvania-Reading Seashore Lines for certain construction needed to eliminate grade crossings at Absecon; that Anthony P. Miller, Inc., had "subcontracted to Harry T. Campbell Sons Co., a corporation, the work of unloading and placing said ballast, and said Campbell for the performance of its subcontract requires the services of union engineers and union laborers;" that a representative of the last-named corporation had "endeavored to arrange with * * * the business agent of International Union of Operating Engineers, Local No. 825 and 825-A for the furnishing of an engineer and an apprentice for operating a steam locomotive in connection with the unloading of said stone ballast and was informed" by the agent "that if said stone ballast was obtained from Kingston Trap Rock Co., the Lambertville Quarry or the

Pennington Quarry, all of which" it was "claimed were under one management, his men would not go to work for the reason that there was a strike at the Kingston Trap Rock Co. plant;" that the last mentioned union "did induce one Daniel del Grande (an appellant herein), the state organizer of the International Hod Carriers, Building and Common Laborers Union of America, to refuse to permit the laborers and members of his said union to unload, place or handle the crushed stone rock ballast coming from the Kingston Trap Rock Co.," and "to withhold the supply of labor from said job, for so long a time as the said Anthony P. Miller, Inc., should purchase or attempt to purchase stone from the complainant, Kingston Trap Rock Co.;" and that, as a result of the refusal of the last named union "to furnish any laborers or to permit its members to work in and about the unloading, placing or handling of any crushed stone ballast purchased by Anthony P. Miller, Inc., from Kingston Trap Rock Co. claiming that said stone originated in a yard or plant which was unfair to organized labor," the respondent Trap Rock Co. "fears" that Anthony P. Miller, Inc., will "cancel its aforesaid contract" with it, and thereby it will "lose large sums of money and said valuable contract as well as business with other prospective customers."

Upon the filing of the supplemental bill, the learned Vice-Chancellor allowed a rule to show cause embodying the restraints outlined *supra;* and, upon the return day, these limitations were "continued in full force and effect until final hearing." The appeal is from this order.

The Vice-Chancellor concluded that the things thus alleged constituted "a secondary boycott against complainants' customers," and that the averments were sustained by the proofs: He cited the following cases as furnishing authority for that view: *A. Fink & Son* v. *Butchers' Union, &c., 84 N. J. Eq. 638; Perfect Laundry Co.* v. *Marsh, 120 N. J. Eq. 508; Kitty Kelly Shoe Corp.* v. *United Retail Employes, &c., 125 N. J. Eq. 250; Evening Times Printing, &c., Co.* v. *American Newspaper Guild, 124 N. J. Eq. 71.*

*First:* At the outset, the inquiry is whether the objects of the "primary strike" are lawful. The Vice-Chancellor pro-

ceeded on the hypothesis that they take that classification. But it is the insistence of respondents that the strike "had these objects, or one of these objects: (a) to compel the employer to recognize disputed claims of the employes; (b) to compel non-union men presently employed to join the Union or forfeit their jobs." And it is said that the first of these "was unlawful because in violation of the written agreement of the Unions to submit all such disputes to arbitration and to refrain from striking pending such arbitration;" and that the second "is unlawful because in violation of the rights of these non-union men and their employer, and because contrary to public policy." Neither of these points is well taken.

As to the first, there is persuasive evidence that, prior to the declaration of the strike, the signatory employer had deliberately violated the agreement in substantial particulars, and had thereby manifested a determination to renounce its provisions, particularly those prescribing wage standards; and, in its original bill, this employer declared that, for "misrepresentations made to it by said Unions through their several agents, servants and representatives" (*i. e.,* that "a majority of the employes" of the Trap Rock Co. "were members" of the union "and had authorized" it "to act as their sole bargaining agent relative to their employment"), and also for "the breach and violation of said contracts * * * by said Unions (*i. e.,* the declaration of a strike without resort to arbitration) * * *, it is entitled to be relieved from the terms and obligations of said contracts, and it hereby elects the right to rescind said contracts and to have the same forthwith canceled and terminated," and prayed, *inter alia,* for a decree that the contracts "are null and void and of no force and effect." And an affidavit made by one of their counsel reveals that respondents would not "forego their right to rescind the contracts," but would undertake only "to recognize the unions as a bargaining representative of their respective members," and "to arbitrate all questions of wage shortages."

The proofs are convincing that the genesis of the strike lay in the employers' refusal to comply with the wage provisions of the contracts, and that its objects were reimbursement of the "wage shortages" and the maintenance of the

wage scale laid down in the contracts; and these considerations constituted ample justification for the exercise by the workmen of their fundamental right to strike for the betterment of their condition.

And, by the same token, the second ground is devoid of substance. But, if the prime purpose were a "closed shop" at the employers' plant, the strike would not thereby be rendered illegal. *Mayer* v. *Journeymen Stonecutters' Association, 47 N. J. Eq. 519;* Jersey City Printing Co. v. Cassidy, 63 N. J. Eq. 759; Bayonne Textile Corp. v. American Federation of Silk Workers, 116 N. J. Eq. 146; Hudson Bus, &c., Association v. Hill Bus Co., 121 N. J. Eq. 582; Four Plating Co., Inc., v. Mako, 122 N. J. Eq. 298; Heyl v. Culinary Alliance, 126 N. J. Eq. 320; McPherson Hotel Co. v. Smith, 127 N. J. Eq. 167.* The weight of authority in this country is that a primary strike for a closed shop is not *per se* unlawful. *E. g., Parkinson* v. *Building Trades Council, 154 Cal. 581; 98 Pac. Rep. 1027; Cohn & Roth Electric Co. v. Bricklayers Union, 92 Conn. 161; 101 Atl. Rep. 659; 6 A. L. R. 887; Kemp v. Division No. 241, 255 Ill. 213; 99 N. E. Rep. 389; Shaughnessy v. Jordon, 184 Ind. 499; 111 N. E. Rep. 622; Bricklayers Union v. Ruff, 160 Md. 483; 154 Atl. Rep. 52; National Protective Association v. Cumming, 170 N. Y. 315; 63 N. E. Rep. 369; 58 L. R. A. 135; Rhodes Brothers Co. v. Musicians Protective Union, 37 R. I. 281; 92 Atl. Rep. 641.* For collation of cases see *95 A. L. R. 18.* Of this, more hereafter.

Thus we are brought to the secondary question of the validity of the prohibitions laid upon the unions and their members.

*Second:* Appellants maintain that it is the "absolute right" of the members of the union, "either individually or in combination," to "refrain from or refuse to work for persons, firms or corporations who may buy their supplies from or use materials or supplies furnished by" the Trap Rock Co.; and that they may secure, by peaceful means, wholly free of coercion or intimidation, the co-operation to the same end of other unions or labor associations. It is said that, to sustain restraints (b), (c) and (d) in these particulars, "the

proofs must warrant the finding of more than a mere refusal of the defendants to furnish union workers under the circumstances recited, or a mere agreement among the defendants to withhold the furnishing of such workers—the finding must be warranted that such refusal or agreement by and among the defendants did not represent the free choice of the workers themselves, but represented the coercion of their wills by the defendants"—citing *Alfred W. Booth and Brother* v. *Burgess, 72 N. J. Eq. 181.* The contention is well made.

Such conduct is plainly not classable as a "secondary boycott" in the vicious sense. If the members of the appellant unions, singly or in concert, voluntarily "refrain from or refuse to work for" those who, in the transaction of their business, use materials produced by respondents, their action does not constitute an invasion of a legal right, and so the exertion of the injunctive power is unwarranted. The personal liberty and right of property guaranteed by the Fifth and Fourteenth Amendments of the Federal Constitution embrace the right to make contracts for the purchase of the labor of others, and equally the right to contract for the sale of one's own labor. The enjoyment of these constitutional rights is subject always to the fundamental condition that "no contract, whatever its subject-matter, can be sustained which the law, upon reasonable grounds, forbids as inconsistent with the public interests, or as hurtful to the public order, or as detrimental to the common good." *Adair* v. *United States, 208 U. S. 161, 174; 28 S. Ct. 277; 52 L. Ed. 436.* See, also, *Coppage* v. *Kansas, 236 U. S. 1, 14; 35 S. Ct. 240; 59 L. Ed. 441; Hitchman Coal and Coke Co.* v. *Mitchell, 245 U. S. 229; 38 S. Ct. 65; 62 L. Ed. 260.* This right, fundamental in the common law, is also secured by the State Constitution. *Cameron* v. *International Alliance, &c., 118 N. J. Eq. 11.* In *Brennan* v. *United Hatters of North America, 73 N. J. Law 729, 742,* Mr. Justice Pitney said: "The common law has long recognized as a part of the boasted liberty of the citizen the right of every man to freely engage in such lawful business or occupation as he himself may choose, free from hindrance or obstruction by his fellow-men, saving such as may result from the exercise of equal or

superior rights on their part—such, for instance, as the right of fair competition in the like field of human effort—and saving, of course, such other hindrance or obstruction as may be legally excused or justified. This right is declared by our constitution to be unalienable. (Article I, paragraph 1) * * * As a part of the right of acquiring property there resides in every man the right of making contracts for the purchase and sale of property, and contracts for personal services, which amount to the purchase and sale of labor. It makes little difference whether the right that underlies contracts of the latter sort is called a personal right or a property right. It seems to us impossible to draw a distinction between a right of property and a right of acquiring property that will make a disturbance of the latter right any less actionable than a disturbance of the former."

It is the fundamental right of the individual workman to refuse his services no matter by whom sought; and it is likewise his right to enter into a combination for the attainment of objects of common concern, and, in the pursuit thereof, to withhold the services of its members from those whose trade practices are deemed inimical to the common interest. He is "free to abstain from work—for good reasons, for bad reasons, for no reasons;" and he may also enter a "free combination of employes in exercising" the "right to be employed or not as they see fit." *Jersey City Printing Co.* v. *Cassidy, supra.* The law accords to workmen the "right to sell their labor to whom they please, when and under such conditions as they may fix, individually or in combination. They may make rules and regulations, passed in good faith, providing for what they deem to be an economic advantage to themselves. If, in the enforcement of such rules and regulations, they violate no law, but act solely for the declared purpose, the courts ought not and cannot legally enjoin them from such concerted action, simply because such action may affect some employers. How can it be said that such rules and regulations create an unfair restraint of trade? If the law gives the workers such rights, it must protect them in their enjoyment. They cannot be enjoined from their use or interfered with by the courts. Employers have no vested

interest in the labor of workers." *New Jersey Painting Co.* v. *Local No. 26, &c., 96 N. J. Eq. 632, 640.* See, also, *National Protective Association* v. *Cumming, supra; Bohn Manufacturing Co.* v. *Hollis, 54 Minn. 223; 55 N. W. Rep. 1119; 21 L. R. A. 337; McCauley* v. *Tierney, 19 R. I. 255; 33 Atl. Rep. 1.* It is requisite only that the exercise of this right be devoid of the elements of coercion, intimidation, undue molestation or malicious interference as regards the exercise of reciprocal rights by the employer.

Only through labor association may a fair measure of equality be had between the employer and the employe in the making of contracts for the purchase and sale of labor; and this has long been considered as essential to the well-being of society. Trade union membership, like other contractual relationships, is essentially voluntary on both sides. Such organizations come into being for purposes mutually agreed upon. The cohesive force is the common interest. Their right to fix qualifications for membership, and to make rules and regulations for the transaction of their lawful business, is not to be doubted. They may lay down such requirements for admission and such formalities of election as may be considered suitable and proper; and they may confine membership to the original promoters, or limit the number to be thereafter admitted. The power of such a body to make its membership exclusive is incident to its character. The basic theory of such combinations is association mutually acceptable, or in accordance with regulations agreed upon. Enforced admission to membership is manifestly opposed to the scheme of such a society. No person has an abstract or absolute right to such membership. And the right thus to combine is not restricted either to the shop of the employer or to the community. Workmen necessarily have a common interest in the rate of wages and the conditions of labor in the industry generally. The law does not impose any limit upon the bargaining power which labor may acquire by union. It is not the size of the union that taints it with illegality; it is rather the unlawful means or methods employed, or the striving for an unlawful object—the abuse of the power thereby given—that brings it within the condemnation of the law.

*Bayonne Textile Corp.* v. *American Federation of Silk Workers, supra; Cameron* v. *International Alliance, &c., supra.*

And the union may publicly plead its cause even though "there is no immediate employer-employe dispute." It is not essential that the "employer's own employes" be "in controversy with him. * * * A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. * * * The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ. Communication by such employes of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in Thornhill's Case." *American Federation of Labor* v. *Swing, 312 U. S. 321; 61 S. Ct. 568; 85 L. Ed. 513.* Moreover, as pointed out in this case, it is not essential that "members of a union" be authorized by state statute to "make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution." *Senn* v. *Tile Layers Union, 301 U. S. 468; 57 S. Ct. 857; 81 L. Ed. 1229.*

This freedom of action respecting one's own labor is no less sacred than the right of communication. Compulsory service by members of the union to the employer's customer would constitute an invasion of their inalienable constitutional rights; and the fact that the refusal of service is the result of concert of action does not give it the taint of an illegal conspiracy, for such combination is in the pursuit of a common objective deemed to be for the general good and welfare, and is therefore wholly lawful. Such is not to be categorized as a malicious interposition. Concert of action is a conspiracy only if its object is unlawful, or if the means are tainted with illegality. At common law, malice consists

of a wrongful act done intentionally without just cause or excuse. *Bromage* v. *Prosser, 4 B. & C. 247; 10 E. C. L 321; 107 Reprint 1051; 1 C. & P. 475.* An act is not wrongful if done in the exercise of an equal or superior right, and is not infected with a purpose to inflict indirect injury. *Louis Kamm, Inc.,* v. *Flink, 113 N. J. Law 582.* If the thing done by the trade union is associated directly rather than remotely with the pursuit of its legitimate aims, the welfare of society is considered served in a degree sufficient to warrant the correlative interference with the rights of third parties, which after all are essentially relative and are always limitable by the public exigency. Public policy is the public interest. The *desideratum* is social security; and its attainment of necessity requires the finding of a basis for rational compromise between individual rights and the public welfare. *Cameron* v. *International Alliance, &c., supra.* "The interrelation of the activities of our people and the complexity of our economic interests" require the use of reasonable means to "safeguard the economic structure upon which the good of all depends." *Home Building and Loan Association* v. *Blaisdell, 290 U. S. 398; 54 S. Ct. 231; 78 L. Ed. 413.* "Injury * * * is never good, but to suffer it may entail less evil than to attempt to check it by legal means. * * * In the last analysis this freedom to commit injury, and the bounds imposed upon it, are regulated by what has been thought to be public policy." *Foster* v. *Retail Clerks' International Protective Association, 39 Misc. 48; 78 N. Y. S. 860.*

There is a well-recognized distinction between a primary and a secondary boycott. The latter has been defined as "a combination not merely to refrain from dealing with complainant, or to advise or by peaceful means to persuade complainant's customers to refrain ('primary boycott'), but to exercise coercive pressure upon such customers, actual or prospective, in order to cause them to withhold or withdraw patronage from complainant through fear of loss or damage to themselves should they deal with it." Such secondary boycott was denounced as a conspiracy in restraint of trade violative of the Sherman Anti-Trust Act (*15 U. S. C. A. § 1-7*), if obstructive of the free flow of interstate commerce.

*Duplex Printing Press Co.* v. *Deering, 254 U. S. 433; 41 S. Ct. 172; 65 L. Ed. 349; 16 A. L. R. 196; Lowe* v. *Lawlor, 208 U. S. 274; 28 S. Ct. 301; 52 L. Ed. 488; Same Case, 235 U. S. 522; 35 S. Ct. 170; 59 L. Ed. 341.* And in the later case of *Truax* v. *Corrigan, 257 U. S. 312; 42 S. Ct. 124; 66 L. Ed. 254,* Chief-Justice Taft declared: "A secondary boycott of this kind is where many combine to injure one in his business by coercing third persons against their will to cease patronizing him by threats of similar injury. In such a case the many have a legal right to withdraw their trade from the one, they have the legal right to withdraw their trade from third persons, and they have the right to advise third persons of their intention to do so when each act is considered singly." See the recent case of *E. L. Kerns Co.* v. *Landgraf, 128 N. J. Eq. 441.*

It is worthy of note that there has been a drastic curtailment of the equity jurisdiction of federal courts in the sphere of labor controversies. *Vide,* Norris-LaGuardia act, *29 U. S. C. A. §§ 101, et seq.* This statute applies to labor disputes between "persons who are engaged in the same industry, trade, craft or occupation; or have direct or indirect interests therein." Its design was to correct what had been considered a "misinterpretation" of the pre-existing Anti-Trust Act in such cases as *Duplex Printing Press Co.* v. *Deering, supra.* See *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, 311 U. S. 91; 61 S. Ct. 122; 85 L. Ed. 91.*

And there is authority for the proposition that peaceful "picketing may be carried on not only against the manufacturer but against a non-union product sold by one in unity of interest with the manufacturer who is in the same business for profit;" and this for the reason that, "where a manufacturer pays less than union wages, both it and the retailer who sells its products are in a position to undersell competitors who pay the higher scale, and this may result in unfair reduction of the wages of union members. * * * Where the manufacturer disposes of the product through retailers in unity of interest with it, unless the union may follow the product to the place where it is sold and peacefully ask the public to refrain from purchasing it, the union would be

deprived of a fair and proper means of bringing its plea to the attention of the public." *Goldfinger* v. *Feinluch, 276 N. Y. 281; 11 N. E. Rep. (2d) 910.*

The "voluntary adoption" by the union membership "of reasonable rules relating to persons for whom and conditions under which its members shall work" is within the essential powers of the combination; and the enforcement of rules by the association, "through fines or by expulsion" therefrom, does not have the vice of illegality. "An association of individuals may determine that its members shall not work for specified employers of labor. The question ever is as to its purpose in reaching such determination. If the determination is reached in good faith for the purpose of bettering the condition of its members and not through malice or otherwise to injure an employer, the fact that such action may result in incidental injury to the employer does not constitute a justification for issuing an injunction against enforcing such action. * * * Voluntary orders by a labor organization for the benefit of its members and the enforcement thereof within the organization is not coercion. The members of the organization, as we have already stated, who are not willing to obey the orders of the organization are at liberty to withdraw therefrom. The bounds beyond which an association of employes may not, as a general rule, go in controlling its members in their dealings with employers are not easily determined. They cannot at least extend beyond a point where its or their direct interests cease. There is a material difference in the power of an association so far as it affects its primary or secondary interest. Where the acts of employe or employes in their individual or associate capacity are reasonably and directly calculated to advance lawful objects, they should not be restrained by injunction. A strike or boycott may be legal or illegal according to the acts involved therein; so an action for a direct and primary purpose in the interest of individuals or a combination of individuals taken in good faith to advance the interest of individuals or combination may be lawful, while a remote and secondary action which carries with it a degree of malice as a matter of law is illegal." *Bossert* v. *Dhuy, 221 N. Y. 342; 117 N. E. Rep. 582.* In

that case, a distinction was made between a purpose to induce the public to discontinue use of complainant's material and the "voluntary" determination of the members of the union "to decline using material made in non-union shops," which was found not to "extend beyond such refusal to install non-union made material, and, so far as it amounted to either a strike or a boycott, it directly affected the Brotherhood and its members." See, also, *Auburn Draying Co.* v. *Wardell, 227 N. Y. 1; 124 N. E. Rep. 97; 6 A. L. R. 901.*

For the common law view of the secondary boycott, not always clearly defined, and the rights of workingmen under that system, see *Mogul Steamship Co.* v. *McGregor* (1888), *21 Q. B. D. 544; (1889), 23 Q. B. D. 598; (1892), A. C. 25; Allen* v. *Flood* (1895), *Q. B. D. 21; (1898), A. C. 1; Quinn* v. *Leathem* (1901), *A. C. 495; Sorrell* v. *Smith* (1925), *A. C. 700; Ware & De Freville, Ltd.,* v. *Motor Trade Association* (1921), *3 K. B. 40; Hardie* v. *Lane Chilton* (1928), *2 K. B. 306; Giblan* v. *National Amalgamated Labourers' Union of Great Britain and Ireland* (1903), *2 K. B. 600; South Wales Miners' Federation* v. *Glamorgan Coal Co.* (1903), *2 K. B. 545; (1905), A. C. 239.*

*Chapter 28* of the *Laws of 1883* and *chapter 207* of the *Laws of 1926* (incorporated in the *Revision of 1937* as *sections 34:12-1* and *2:29-77,* respectively) are in their essence affirmatory of the workman's fundamental rights, but they embody also a recognition of trade unions as a component part of our modern social structure. At common law, "every person has a right under the law, as between him and his fellow subjects, to full freedom in disposing of his own labour or his own capital according to his own will;" and "it follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction to the fullest exercise of this right which can be made compatible with the exercise of similar rights by others. Every act causing an obstruction to another in the exercise of the right comprised within this description—done, not in the exercise of the actor's own right, but for the purpose of obstruction— would, if damage should be caused thereby to the party obstructed, be a violation of this prohibition; and the viola-

tion of this prohibition by a single person is a wrong, to be remedied either by action or by indictment, as the case may be." *Allen* v. *Flood, supra.*

For the early common law concept of the combination and the subsequent modification, see *Rex* v. *Cambridge Journeymen-Taylors, 8 Mod. 11; 88 Reprint 9; Reg.* v. *Rowlands, 5 Cox C. C. 436; Hilton* v. *Eckersley, 6 E. & B. 47; 88 E. C. L. 47; 119 Reprint 781; Rex* v. *Mawbey, 6 T. R. 619; Mogul Steamship Co.* v. *McGregor, supra; People* v. *Fisher, 14 Wend. (N. Y.) 9,* and dissenting opinion of Mr. Justice Brandeis in *Truax* v. *Corrigan, supra.*

It results that the restraints in these respects are in contravention of appellants' fundamental rights.

And there is an utter absence of proof of "threats of violence" to warrant the limitation embodied in subdivision (a). The term "conspiracy" viewed in relation to the context and the circumstances, has reference merely to agreement between the workmen in the exercise of what is here found to be their right under the law.

The order is accordingly reversed.

*For affirmance*—None.

*For reversal*—The Chief-Justice, Parker, Case, Bodine, Donges, Heher, Perskie, Porter, Dear, Wells, Wolfs-Keil, Rafferty, Hague, JJ.   13.