OUTDOOR SPORTS CORPORATION, A NEW JERSEY COR-
PORATION, PLAINTIFF-RESPONDENT, v. AMERICAN
FEDERATION OF LABOR, LOCAL 23132, AND FRANK
TRUATT AND METROPOLITAN AUTO RACING ASSO-
CIATION, INC., DEFENDANTS-APPELLANTS.

Argued December 4, 1950—Decided January 15, 1951.

218

222

*Mr. Thomas L. Parsonnet* argued the cause for appellants (*Messrs. Parsonnel, Weitzman & Oransky,* attorneys).

*Mr. Norbury C. Murray* argued the cause for the respondent.

The opinion of the court was delivered by

OLIPHANT, J. This appeal is here on our own motion. It is from an interlocutory injunction entered in the Chancery Division restraining the defendant from:

(A) Picketing with or without signs or placards at Ruppert Stadium, Wilson Avenue and Avenue K, Newark on any evening or afternoon whereon any race meet is scheduled to be held by the plaintiff.

(B) Interfering in any manner at any time with any person desiring or intending to participate in any capacity, or to patronize any of said race meets of plaintiff, and from attempting to persuade any of them from so doing.

(C) Representing in any manner to prospective patrons of or contestants in any of said race meets to be held by plaintiff that any labor dispute or that any dispute involving employer-employee relation

exists between plaintiff and any of said defendants or members of defendant organizations or implying that plaintiff is unfair to union labor.

On May 5, 1950, respondent, without notice, obtained an order to show cause with an *ad interim* restraint, why an injunction should not issue against picketing and similar activities on the part of the appellants. Pursuant to notice to the appellants the matter was heard on May 25, 1950, and witnesses for both sides were examined and cross-examined. The interlocutory injunction was entered July 14, 1950.

The respondent corporation had arranged to conduct for a profit a series of meets for races between stock car automobiles during the racing season from May to September, 1950, at the Ruppert Stadium at Wilson Avenue and Avenue K in Newark. It had leased the stadium and had invested a substantial amount of money in the race track. It entered into a contract with the National Association for Stock Car Auto Racing, Inc. (hereafter referred to as Nascar) whereby the respondent agreed to permit as entries to its races only owners, drivers and mechanics licensed or approved by Nascar. With the consent of Nascar, a similar agreement was also entered into with the Atlantic Stock Car Racing Club, Inc. (hereafter referred to as Atlantic).

The car owners, drivers, and mechanics who enter or participate in the races conducted by the respondent are not its employees or the employees of Nascar or Atlantic. Only members of these two associations are allowed to drive at this particular track. For their participation in the events they receive shares in the purses which are paid to Nascar and Atlantic and by them divided among the various races on each day. There was a flat purse of $2,000 apparently for each day. This purse was divided among the contestants in the same proportion according to the finishing position in each race but the tail enders received no remuneration.

The owners and drivers are under no obligation to race if they do not want to but they are permitted to file an entry and commit themselves to come and race at the meet. The entries close about an hour before race time.

Neither the plaintiff, Nascar nor Atlantic provide for any unemployment compensation or social security or workmen's compensation for any of the owners, drivers or mechanics who participate in the races. Nascar provides insurance for its members covering medical and other expenses resulting from racing accidents, to which plan the drivers, racers and mechanics contribute, but not the promotors.

The defendant union is composed of owners, drivers, and mechanics who are or have been members of Atlantic and who are also members of the defendant Metropolitan Auto Racing Association, Inc. (hereafter referred to as Metropolitan), which in turn is affiliated with some twelve similar associations. Metropolitan is still an actual operating corporation and though while heretofore all negotiations for participation in the races were made by an agent appointed by it, the present arrangement is that negotiations with the promotors who operate the tracks will be carried on through the union and its officers.

Shortly before the filing of the complaint in this cause the union agents demanded that the respondent sign a written contract with the appellant, American Federation of Labor, Local 23132, which would require (a) that the respondent deal with the labor union as bargaining agent for the race participants, (b) that none but members of the Metropolitan and the defendant union be permitted to participate in the races, (c) that the purses be paid over to the union for distribution, (d) that the purses be divided among the participants according to the union rules, (e) that the purses constitute 40% of the gate receipts rather than an amount fixed by the respondent, (f) that the races be conducted under the rules of the union rather than under the rules of Nascar or Atlantic, (g) that the participants pay to a benevolent fund to be administered by the union $1 per participant per race and that this amount be matched by the plaintiff. Several meetings were held at which attempts were made to negotiate a contract but they all failed because the respondent contended the race drivers and owners were not its employees even though it was admitted that other employees of the

respondent who performed services in the operation of the stadium were union members.

The representative of the union flatly stated to the respondent and its officers that if they were not willing to negotiate and recognize the union and use the union members on the race track that they would be picketed and that the picket line would cause the union workers in the stadium to stay away from their work. Efforts would be made to keep other drivers and cars from coming in and that they would make sure that the race meet would not be held with them picketing since they expected that the other American Federation people employed would not cross the picket line. A deadline was fixed at which the contracts should be signed or the picketing start. Truatt, the union delegate, admitted that he told the respondent that that was what would probably happen in this case. He disarmingly testified that he did use the words "that we would tie up the stadium. In fact, I did use that because I said that 'you leave us with no other recourse other than the attempting to force economic pressure.' But I didn't use it in the way of meaning that we would tie it up, because our Unions don't proceed along them lines." In this posture of affairs the respondent applied for the *ad interim* restraint and the interlocutory injunction above mentioned.

The trial court in its order found (1) that the union demands, if granted, would require the respondent to breach its contracts with Nascar and Atlantic, (2) but that if the union demands were refused and its threats carried out the holding of races by the respondent would be hampered or even prevented, thereby causing great financial loss, (3) that no adequate remedy was available at law, (4) that none of the defendants or those they represent had any right or interest in the races, (5) that no labor dispute existed within the meaning of *R. S.* 34:12–1 or *R. S.* 2:29–77.8, (6) that an injunction was necessary in order to protect the rights of the plaintiff. On the basis of these findings the restraints above set out were included in the interlocutory injunction appealed from.

The first point of the appellant is that *P. L.* 1941, *c.* 15 as amended by *R. S.* 2:29–77.1 *et seq.* prohibits the issuance of an injunction on the facts of this case.

 At the outset it should be stated that it has been held that *R. S.* 2:29–77.1 *et seq.* is essentially procedural in its provisions. *Isolantite, Inc., v. United Electrical, etc., Workers, C. I. O.,* 132 *N. J. Eq.* 613 (*E. & A.* 1942), and for this reason its procedural provisions were incorporated by reference in *Rule* 3:65–9. *Winberry v. Salisbury,* 5 *N. J.* 240 (1950). The various acts and rights of employees, which are declared by *R. S.* 2:29–77.2 as a matter of public policy, to be lawful, were all lawful prior to the enactment of the statute and the statute is merely declaratory of the existing substantive law at the time. *Westinghouse Electric Corp. v. United Electrical, etc., Union, C. I. O.,* 139 *N. J. Eq.* 97 (*E. & A.* 1946). It should be noted that section (e) of *R. S.* 2:29–77.1 provides that the giving of publicity to the existence of, or the facts involved in any labor dispute must be without fraud or violence, or by any other method not involving fraud or violence, and not in violation of any other law of the State of New Jersey.

The appellants' argument is that the limitations of the statute apply to this cause since the appellants and respondent are in the "same business" and that there is a "labor dispute" within the meaning of that phrase as defined in the act. The appellant quotes and argues that *R. S.* 2:29–77.8 provides, *inter alia,* that. "A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in industry, trade, craft, employment, or occupation * * * regardless of whether or not the disputants stand in the proximate relation of employer and employee."

██ We can agree that a primary relationship of employer and employee is not required to make the benefits of the act available to the disputants and that under certain facts and conditions, it is available to disputants who are employees of independent contractors or customers or persons associated with or connected to the primary disputants because of a unity of interest in the terms and conditions of employment. We

likewise agree it is not necessary that all the disputants must stand in the proximate relationship of employer and employee one to the other, provided they are engaged in the "industry, trade, craft, or occupation in which such dispute occurs." *R. S.* 2 :29–77.8(b).

■ ■ However, a reading of the entire act indicates a clear intention to effect improvement in the terms and conditions of employment by promoting amicable relations between employers and employees through the encouragement of peaceful settlements of disputes concerning the terms and conditions of employment. The act is bottomed in the employer and employee relationship, *R. S.* 2 :29–77.1, 77.4, 77.8 and the phrase "labor dispute" as defined and used in the act necessarily must be founded upon or proximately grow out of a basic relationship of employer and employee and a dispute concerning terms or conditions of such employment.

The language of *R. S.* 2 :29–77.8 is clear and explicit. It provides, *inter alia:* "(c) The term 'labor dispute' includes any controversy concerning *terms or conditions of employment,* or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange *terms or conditions of employment, or concerning employment relations,* or any other controversy arising out of *the respective interests of employer and employee,* regardless of whether or not the disputants stand in the proximate relation of *employer and employee.*" (Italics supplied.)

■ ■ It should be obvious that a dispute between members, officers, or agents of or any associations of employers is not within the purview of the act even though the resolution of the dispute might have a direct or proximate effect upon the terms and conditions of employment in the industry, trade, craft or occupation, in which the dispute arose. The provisions of the *Norris-LaGuardia Act,* 29 *U. S. C. A.,* § 113, which is somewhat similar to our own provision *R. S.* 2 :29–77.8 has been so construed. *Columbia River Packers, etc., v. Hinton,* 315 *U. S.* 143, 62 *S. Ct.* 520, 86 *L. Ed.* 750 (1942) ; *Bakery Sales Drivers, etc., v. Wagshal, etc.,* 333 *U. S.* 437, 68 *S. Ct.* 630, 92 *L. Ed.* 792 (1948) ; cf. *Kohn v. Local,*

*etc.,* 132 *N. J. Eq.* 512 (*Ch.* 1942). We concur in the finding below that *R. S.* 2:29–77.1 *et seq.* is not applicable in the absence of an employer and employee relationship and a labor dispute either directly or proximately related thereto.

It is of the essence of the employer-employee relationship that there be a hiring for a fixed or definite period of time for either fixed wages or some form of remuneration fixed or agreed upon and that the employee's work should be subject to the direction and control of the employer.

The only compensation which the entrants in the races here involved receive is a share of the stated purse as prize money. To consider them as employees of the respondent merely because the respondent may or may not make a profit from the operations promoted by him would result in a conclusion which ignored the true factual situation. From such a conclusion it would seem to follow that any competitor in a sporting event or other event of skill held for prize money or prizes would become an employee of the person or corporation holding the event or contest. For example, a golfer competing in a professional championship at a golf club would be considered an employee of the golf club, a race horse owner would become an employee of a race track company and even an amateur athlete might possibly be considered an employee of the association which promoted the event in which he competed simply because the organization promoting the contest might or might not make a profit from the admissions charged thereto. The logic of the facts of common experience overthrows such a contention and unequivocally leads to the conclusion that the race drivers here involved are not or were not employees of the respondent.

As to the contention that the statute provides that there is a labor dispute "regardless of whether or not the disputants stand in the proximate relationship of employer and employee," this provision is also merely declaratory of the substantive law as it existed prior to the enactment of the act since it was held in *Kingston Trap Rock Co. v. International Union, etc.,* 129 *N. J. Eq.* 570 (*E. & A.* 1941), that a peaceful voluntary secondary strike or boycott or picketing

where there is a unity of interest among the employees or persons involved is lawful. See also *Allen Bradley Co. v. Union,* 325 *U. S.* 797, 65 *S. Ct.* 1533, 89 *L. Ed.* 1939 (1945) ; *New Jersey Painting Co. v. Local 26, etc., Painters,* 96 *N. J. Eq.* 632 (*E. & A.* 1924) ; *Bayer v. Brotherhood of Painters, etc.,* 108 *N. J. Eq.* 257 (*E. & A.* 1931). But the statute does not declare or make acts lawful which prior to its enactment were unlawful or held to be illegal, and this is particularly true where there is no relationship of employer and employee.

 It was held in *Louis Kamm, Inc., v. Flink,* 113 *N. J. L.* 582, 587, 588 (*E. & A.* 1934), that " 'Every one has a right to enjoy the fruits and advantages of his own enterprise, industry, skill and credit. He has no right to be protected against competition, but he has a right to be free from *malicious and wanton interference, disturbance, or annoyance.* If disturbance or loss comes as a *result of competition, or the exercise of like rights by others,* it is *damnum absque injuria,* unless some superior right by contract or otherwise is interferred with. But if it comes from the *merely wanton or malicious* acts of others, without the *justification of competition or the service of any interest or lawful purpose,* it then stands upon a different footing' * * * yet when he oversteps that line and commits an act with the *malicious intent of inflicting injury upon his rival's business,* his conduct is illegal, and if damage ensues from it the injured party is entitled to redress." See *Van Horn v. Van Horn,* 56 *N. J. L.* 318 (*E. & A.* 1893) ; *The Aalfo Co. v. Kinney,* 105 *N. J. L.* 345 (*E. & A.* 1929) ; *Newark Hardware & Plumbing Supply Co. v. Stoves Mfgrs. Corp.,* 136 *N. J. L.* 401; affirmed, 137 *N. J. L.* 612 (*E. & A.* 1948) ; *Cooley on Torts* (*4th ed.*), § 230.

 The conduct and action of the defendants and their threats of interference with the business of respondent clearly come within these principles. The injury threatened and complained of is an irreparable injury which cannot be adequately compensated in damages and therefore an interlocutory injunction should properly have issued under the circumstances of this case. *Scherman v. Stern,* 93 *N. J. Eq.* 626 (*E. & A.* 1922) ; *Phelps Dodge, etc., Corp. v. United Electrical, R.*

*and M. W. of America,* 138 *N. J. Eq.* 3, at *p.* 11; affirmed, 139 *N. J. Eq.* 97 (*E. & A.* 1946).

 The object of an interlocutory injunction is to prevent some threatening irreparable mischief which should be averted until opportunity is offered for a full and deliberate investigation of the case. Acts destroying a complainant's business, custom and profits do an irreparable injury and authorize the issuance of a preliminary injunction. *The Evening Times Printing, etc., Co. v. The American Newspaper Guild, et al.,* 124 *N. J. Eq.* 71 (*E. & A.* 1938), and the cases cited there at *page* 74; *Pomeroy's Equity Jurisprudence (4th ed.),* § 1338.

The second point of the appellant is that the injunction violates their right of free speech in violation of Article I, paragraph 6 of the State Constitution and the Fifth and Fourteenth Amendments of the United States Constitution. The appellant relies on *Schneider v. Irvington,* 308 *U. S.* 147, 60 *S. Ct.* 146, 84 *L. Ed.* 155 (1939); *Thornhill v. Alabama,* 310 *U. S.* 88, 60 *S. Ct.* 736, 84 *L. Ed.* 1093 (1940); *Carlson v. California,* 310 *U. S.* 106, 60 *S. Ct.* 746, 84 *L Ed.* 1104 (1940); and other cases of similar import.

 The United States Supreme Court has since made it clear that the principles of these cases do not apply to the situation here under consideration. The court held that the very purpose of a picket line is to exert influences, and it produces consequences different from other modes of communication, and it recognized that picketing not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of the State if the manner in which the picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance.

 A state may not set up artificial unreal boundaries in the light of modern circumstances as to what constitutes an industrial relationship or a labor dispute. A state may direct its law against what it deems the evil as it actually exists without covering the whole field of abuses, and it may do so

nonetheless that the forbidden act does not differ in kind from those that are allowed.

The policy of a state may rely for the common good on the free play of conflicting interest and leave conduct unregulated. On the other hand, a state may deem it a wiser policy to regulate. Regulation may take the form of legislation, judicial decision or the common law. Whatever form the regulation takes it is to be obeyed and the state is left the choice of method and can decide between placing confidence in an injunction proceeding rather than to rely exclusively on a policeman's club. *Milk Drivers Union, etc., v. Meadowmoor Dairies, Inc.,* 312 *U. S.* 287, 61 *S. Ct.* 552, 85 *L. Ed.* 836 (1940); *Giboney v. Empire Storage & Ice Co.,* 336 *U. S.* 490, 69 *S. Ct.* 684, 93 *L. Ed.* 834 (1949); *Hughes v. Superior Court of California,* 339 *U. S.* 460, 70 *S. Ct.* 718, 94 *L. Ed.* 985 (1950); *International Brotherhood, etc., v. Hanke,* 339 *U. S.* 470, 70 *S. Ct.* 773, 94 *L. Ed.* 995 (1950); *Building Service Employees, etc., v. Gazzam,* 339 *U. S.* 532, 70 *S. Ct.* 784, 94 *L. Ed.* 1045 (1950).

These cases do not authorize a state to prohibit peaceful picketing or a voluntary boycott for a lawful purpose, nor do they prevent a state from declaring unlawful coercive picketing or a secondary coercive boycott in aid of a labor dispute or unlawful purpose. *Cf. Senn v. Tile Layers Protective Union,* 301 *U. S.* 468, *p.* 479, 57 *S. Ct.* 857, 81 *L. Ed.* 1229 (1937); *A. F. L. v. Swing,* 312 *U. S.* 321, 61 *S. Ct.* 568, 85 *L. Ed.* 855 (1940); *Kerns v. Landgraf,* 128 *N. J. Eq.* 441 (*E. & A.* 1940).

The final point of the appellant is that the relief contained in the injunction is vague, indefinite and so broad as to be unenforceable. An examination of the restraining paragraphs fails to sustain this contention.

The interlocutory injunction is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—Justice HEHER—1.