34 N.J. Super. 34 (1954)
111 A.2d 308
VALESKA HAMMER & OSCAR HAMMER, PARTNERS, DOING BUSINESS AS WELLER EMBROIDERY CO., PLAINTIFFS,
v.
LOCAL NO. 211, UNITED TEXTILE WORKERS OF AMERICA, A.F.L.; JOSEPH G. QUINN, ROBERT E. COLE, PETER HEAVEY, LOUIS GIULIANO, JEREMIAH SULLIVAN; LOCAL NO. 560, INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND CHAUFFEURS, A.F.L.; JOHN H. CONLIN, ANTHONY PROVENZANO AND ROBERT BOYD, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 18, 1954.
*36 Messrs. Carpenter, Gilmour & Dwyer (Mr. Thomas L. Morrissey appearing), attorneys for plaintiffs.
Mr. Jacob Friedland, attorney for defendants.
DREWEN, J.C.C. (temporarily assigned).
Suit is brought to restrain defendants and their representatives from picketing plaintiffs' plant in Union City and from engaging in other related activities directed toward interference with the conduct by plaintiffs of their trade and business conducted thereat.
Hearing on application for preliminary restraint was had before Judge Stanton and concluded December 2, 1953. Final hearing came on before me and was concluded June 30, 1954. Judge Stanton made factual findings which are in part as follows: (a) placards carried for and on behalf of defendants by persons engaged in picketing bore legends proclaiming that a strike was in progress at plaintiffs' plant, though in truth and in fact there was no strike; (b) a physical assault had been committed by one or more of defendants' representatives upon one of the plaintiffs; (c) plaintiffs' trucks had been followed by certain of defendants' representatives; threats and intimidation had been exerted by said representatives to induce non-delivery to and from plaintiffs' plant of goods and merchandise used in or produced at the plant; (d) other persons and concerns doing business with plaintiffs were visited at their plants located in other counties of this State; and were there threatened with the *37 placing of picket lines at their respective plants in the event they continued to do business with plaintiffs; (e) in consequence of the said conduct by defendants and persons acting in their behalf plaintiffs had suffered and were continuing to suffer irreparable loss and injury.
After extensive hearings preliminary restraints were ordered by Judge Stanton under date of December 8, 1953, as follows: (a) from representing by placards or orally that there was a strike in progress at plaintiffs' Union City plant; (b) from following trucks and from interfering physically in any way with the shipment of merchandise in or out of plaintiffs' said plant, and from threatening or intimidating any person engaged in the handling or transportation of such shipments; (c) from interfering with any person having business with plaintiffs in going to and coming from plaintiffs' said plant; (d) from using obscene language directed at plaintiffs, their employees or any person having business with them. The restraining order expressly allows peaceful picketing of plaintiffs' plant and the display of placards by the pickets indicating that the defendant unions are "engaged in a campaign to organize the employees of plaintiffs."
Final hearing had been set for June 21, 1954. For reasons appearing in the transcript, defendants' counsel did not appear at that time but plaintiffs' proofs were taken notwithstanding. A transcript of these proofs was served on defendants' attorney and defendants were given leave to cross-examine plaintiffs' witnesses and to adduce proofs of their own on June 30, 1954, at 10 A.M. Conjointly with service of the transcript plaintiffs gave notice that based upon the additional proofs contained in the transcript of June 21, and upon the violations of the restraining order claimed to be shown therein, plaintiffs would apply to the court for a judgment that no labor dispute was involved in the case within the meaning of the statute of this State, and also for an order restraining defendants from any and all picketing at plaintiffs' plant. On June 30, 1954, upon *38 the return of said notice, further proofs were taken whereupon the parties rested.
It is stipulated in the pretrial order that the proofs taken on the application for preliminary restraint shall be considered upon the trial of the issues, which, as the same are stated in the pretrial order, are:
"(a) Whether the picketing and other activities of the defendants are for a lawful objective; (b) Whether there is a labor dispute within the meaning of the New Jersey Anti-Injunction Act; (c) Whether the plaintiffs have failed to comply with the provisions of N.J.S. 2A:15-54; (d) Whether the Congress, in the enactment of the Labor Management Relations Act of 1947, has deprived this court of jurisdiction to grant the relief which plaintiffs seek; (e) Whether the plaintiffs are entitled to the injunctive relief demanded; (f) Whether the defendants are warranted in picketing as they have by virtue of the 1st and 14th Amendments to the United States Constitution and by virtue of Article I of the New Jersey State Constitution."
By the aforementioned notice returnable June 30, 1954 plaintiffs did no more than declare their purpose to apply on the basis of all the proofs, including those of June 21, for what they asked in the first instance, i.e., the restraint of all picketing.
The task devolved upon me by the situation described has required, in addition to consideration of the proofs taken before me, a careful reading of the testimony heard in the contest for preliminary restraint, as well as examination of the exhibits introduced in that connection. All this has been done, but it should be noted further that the witnesses giving such preliminary testimony also appeared and testified before me at the sessions of June 21 and June 30, 1954; this is true with a few exceptions that I deem unimportant. I mention the fact to show that having heard, in part at least, the persons by whom the essential testimony for both sides has been given, the preliminary record as examined by me was not just cold print.
Dealing first with the proofs relating to the period following the restraining order of December 8, 1953, I find *39 that the court's order has been violated in two respects. The defendant Quinn is shown, on more than one occasion, to have used obscene language to a plaintiffs' employee, Sandman. It is proved that Quinn and two or more other representatives of defendants were at a point opposite the plant and on the other side of the street when Sandman appeared in front of the plant premises. Quinn denies that what he said was addressed to Sandman but this is of no moment so long as it was, which I find the fact to be, intended for his hearing and, as Quinn admits, had Sandman in reference. In this reference what Quinn suggested to his companions at the time was that Sandman adapt himself to certain somatico-mechanical uses, fully detailed by Quinn and being ultra-Rabelaisian to the point, in all conscience, of being nothing less than repulsively obscene. Literal repetition is unnecessary; the testimony leaves no doubt of what was said. Quinn as a witness is rather flippant about the episode, and defendants' witness Shaub, who was present at the time, would make a joke of it. But none of this avails to abate the offense. And Quinn and Shaub themselves make it emphatically clear that Quinn's performance was loud. Quinn says "I spoke loud." And again, "Well, I talk loud anyway. I get condemned at home for talking too loud from the family. It is a habit." And again, "Perhaps I said it loud, yes." Shaub says, "Well, he (Quinn) is naturally a loud talker anyway." And in another connection Quinn is described as speaking in a "loud and threatening voice," and also as proclaiming, before the preliminary restraint, that he would follow the plaintiffs' trucks "to hell."
Defendants contend there was provocation, that intemperate and truculent language had first been used by Sandman, but I don't find that to be so. In his denial of this Sandman is amply corroborated. In addition, there is nothing imputed to Sandman in this connection that can justify the violation of restraint that I adjudge to have been committed.
Another instance is shown in which defendant Quinn is said to have directed epithets, violative in character and *40 specified in the proofs, against the same employee. Having in mind the temper and temperament of this defendant, as so clearly delineated in the proofs, it would be naive, in my opinion, to disbelieve what plaintiffs' witnesses say in this entire regard.
But important as are the foregoing breaches of restraint, a far more important factor in the proofs relates to continued flouting of the terms of the court's order of December 8 having to do with defendants' interference with trucks arriving at plaintiffs' plant for the receipt and delivery of merchandise. There will be further reference to the position in this suit of the defendant Local No. 560 of the Brotherhood of Teamsters and Chauffeurs, in whose name ostensibly this trucking interference has been committed. But here it should be noted that immediately before the picketing began, November 2, 1953, defendants Conlin and Provenzano, as executive representatives of Local No. 560, demanded of plaintiffs that the teamster employees be unionized, though there is normally but one, and never more than two or three, of such employees whose occupation would make them eligible for membership in a teamsters' union. The character of the demand is shown in the testimony of Balleisen, plaintiffs' labor consultant, as follows:
"A. * * * He (Provenzano) said to me that he was calling about Weller. I misunderstood his mission, because Mr. Hammer had spoken to me either earlier in the day or the day before about trying to get the truckers union not to honor the picket line. He said he thought he had some chance of having the truck drivers cross the picket line. I assumed it was in regard to that matter. I said to Mr. Provenzano I would like him to see that the truckers honor (sic) that picket line, because the picketing, in my opinion, was illegal, because it was being done for an illegal purpose.
He said, `Well, I didn't call you for that at all.' He said, `I called you to tell you that I represent your shipping and receiving departments and chauffeurs.'
I said to him, `The shipping and receiving employees were in the bargaining unit and voted in the election, and I thought the chauffeur was, as well.'
Q. What election was that? A. The election which was held by the Labor Board, the National Labor Relations Board, on May 28th.
*41 He says, `Well, if they were in the election and in the bargaining unit, I don't want the shipping and receiving employees.' He said, `I want the chauffeur.' I said, `You don't represent the chauffeur.' He said to me, `I don't care whether I represent the chauffeur or not. I want him in my union or else you will have a picket line there tomorrow. And if I put a picket line there it will never come off.'"
Under the circumstances, it is my view that the court has every right to take Provenzano at his word, at the same time being mindful of the utter failure of his statement to take into account any lawful conditioning of the labor prerogative. This testimony is not denied, and additional ground is provided by it for extending full credit to what plaintiffs' witnesses say relative to trucking interference, contrary to the restraint as ordered.
I am fully aware that what plaintiffs assert of the actual conduct of those engaged in the watching and picketing of plaintiffs' plant, these defendants deny, save only as I have otherwise noted. I am aware also that in the resolving of the issues thus presented factual questions must be decided that are vital to the controversy. I need not say that the best this or any court can do in resolving difficulties of the kind is firmly and solemnly to obey the moral conviction created in the court's mind by its appraisal of the total credibility of witnesses and proofs, together with all attendant circumstances, and by giving heed as firmly and solemnly to any failure of such appraisal to create such moral conviction. It is by this cogitative process that all factual determinations have been made.
The proofs, moreover, show that since the issuance of the restraining order the pickets have displayed two signs, one for the teamsters' Local No. 560 and another for the textile workers' Local No. 211; that upon the arrival of a truck at plaintiffs' premises a picket will take up the picketing sign of the teamsters' local and display it to the truckman, at the same time telling him there is a strike at the plant, and that he is not to go upon the plaintiffs' premises. Three or four witnesses for plaintiff give testimony of this, among them *42 plaintiffs' shipping clerk, Ginder, whose work, it appears, requires that he be always at the scene. It is thus shown that constantly since the making of the restraining order and until the present time the conduct of the pickets in this regard has been as described, including the false representation of a strike. On one occasion the arriving truckman had been accosted by the picket Shaub in front of the plant building. Shaub spoke to the driver in front, whereupon Ginder suggested to the driver, apparently out of Shaub's hearing, that the truck be brought to the rear of the building, in the hope that the truckman would not be followed. Ginder's suggestion was taken but Shaub followed the truck. It is Ginder's testimony that upon coming up to the truckman at the rear of the building "He (Shaub) told the truck driver then that we were on strike and what the heck was the idea of coming around from the front, and that the truck driver knew the situation there, that he wasn't supposed to be there at all, that if he did he (Shaub) would get in touch with his truck driver local and take his ticket away from him." Shaub does admit an occasion when he was at the back of the plant engaged in inducing a driver not to leave his merchandise, though he denies making any reference to a strike. However, I find no ground in reason or commonsense for believing that if Shaub or any other picket were bent on no more than informing the driver that the unions' interest in the affair at plaintiffs' plant was entirely organizational, and on asking the driver to cooperate accordingly, leaving it to him to choose his course, that upon the driver's failure to accede he would be pursued further by the picket to another place of entrance to the plant. The following of the truck from front to back is, to me, plain evidence of the intensifying of suasion to the degree of coercion. It gives outstanding plausibility to what plaintiffs' witnesses say, more particularly with respect to Shaub's threatening statement to the driver. Having made my finding on the indicated grounds respecting the single occasion in question, I must in reason and do in fact believe the testimony of plaintiffs' *43 witnesses as to the other occasions. My finding is that the prohibition of the restraining order respecting interference with the transfer of merchandise by trucks to and from plaintiffs' plant has been constantly and consistently violated by the pickets' declaration to the drivers that the employees of plaintiffs' plant were on strike, and so as to violate the order restraining defendants "from threatening or intimidating any person engaged in the handling or transportation of such shipments."
Furthermore, I cannot but see a strongly minatory feature in the pickets' admitted practice of taking down the number of each delivery truck that arrives at the plant and promptly telephoning it to the union headquarters for matter of record, as it is said. However lawful in and of itself such a practice may be claimed to be, it must be regarded as seriously aggravating a situation that is already illegal.
The findings of fact that constitute the basis of the plenary result here are those previously made by Judge Stanton, augmented by my own as set forth in this opinion.
There is one feature of the problem that undercuts all others. What is the object for which this picketing is being done, and is it a lawful object? Plaintiffs contend that the sole object is to destroy their business. Defendants deny this and declare that their single purpose is to organize plaintiffs' employees, at the same time denying especially and emphatically any purpose that could have to do with coercing plaintiffs into designating defendants or either of them as a bargaining agent. This brings the issue into sharp focus, for if the purpose is not to organize the workers, it must be that which plaintiffs say it is; in view of defendants' stated denial it can be nothing else. In determining a factual question of this kind it is actions that must be judged rather than words, and judged in the light of the indispensable principle that men must be presumed to intend the natural and necessary consequences of what they do.
It is admitted that on October 28, 1953 defendants Heavey and Guiliano, as representatives of Local No. 211, demanded *44 of plaintiffs that they sign an agreement recognizing Local No. 211 as the bargaining agent of plaintiffs' employed textile workers, claiming at the time to represent a majority of such employees, though declining to exhibit any evidence of this. On the next day, October 29, 1953, this demand was withdrawn by letter of the local's president, with the admission that the local makes no claim to represent a majority of the employees, the previous claim to that effect being expressly withdrawn. Thenceforth and until and including the present time picketing of plaintiffs' plant has continued. The question persists, with increasing acuteness, for what objective? It is not denied that the employees, without significant exception, are at their work throughout each working day. In the affidavit of defendant Heavey, submitted in this cause and dated November 30, 1953, he says that Local 211 had then been trying to organize plaintiffs' textile employees for the "past two years." No employee had been on the picket line save on the first day when one or two were there for a few hours, and they did not return. Photographs in evidence show three young women bearing picket placards. These pictures were taken on the first day as aforementioned and the young women explain also that they were taken not on the picket line but across the street from it and at the instance of defendant Heavey, who told them the pictures were desired for the "union records." Since then neither of the young women has been seen or heard of in connection with the picketing.
Including the period stated in the Heavey affidavit, it can now be said that for two years and eight months defendant Local No. 211 has been endeavoring to organize these 60-odd employees. The overwhelming proof is that this endeavor, assuming it to have had reality at one time, which does not appear, is now at a standstill, and has been at a standstill ever since Local No. 211 wrote its letter of October 28, 1953, following two years of prior effort. Meanwhile the picketing continues, to plaintiffs' increasing and irreparable injury. *45 The testimony taken at the hearing for preliminary restraint and that taken at the sessions of June 21 and June 30 last leave no doubt of the cumulative havoc being wrought. Ginder, the shipping clerk, states the effect of defendants' conduct on the movement of trucks: "Well, we haven't had any trucks there and half the time we have to do it all ourselves. * * * Some would turn away and some we would induce to drop it in the street some place and then we would have to go and pick it up. That is the only way we could ever get it in." Plaintiff Oscar P. Hammer testifies that normally, that is, prior to the picketing, plaintiffs depended for the transportation of goods to and from the plant upon foreign carriers to the extent of approximately 90%, their own equipment being sufficient only for the remaining 10%. From this it follows that practically all of their trucking is now limited, of necessity, to what they can do themselves, 10%.
It is my opinion that since there is no other legitimate objective in rational view, we must fall back upon that indispensable maxim already cited, that men are presumed to intend the natural and necessary consequences of their acts. This renders inescapable in the instance before us, the conclusion that the only objective of defendants is the destruction of plaintiffs' business. No lawful enterprise is shown of which such a result could be viewed as an unavoidable incident. This conclusion is closely consonant not only with what defendants have done and are doing, but also with what they themselves, and through their representatives, have repeatedly declared they will continue to do, according to the proofs.
The basic right of the plaintiffs to be protected in their business and mercantile property is effectively expounded in Louis Kamm, Inc., v. Flink, 113 N.J.L. 582, 587-588 (E. & A. 1934), these pronouncements having been later applied by our present Supreme Court in the picketing case of Outdoor Sports Corp. v. A.F. of L., etc., 6 N.J. 217, 229 (1951).
*46 The situation before us merits a hard, steady look, for a clear sight of its realities. We dare not be unmindful of fundamentals. Trade unionism, like government itself, is a means to an end; like government it is not an end in itself. The only objects of which the law sanctions pursuit within the sphere of our inquiry are lawful objects. Let us suppose a situation in which a strike were called by a union that at the same time refused to make known the object of the strike or, indeed, that there was any object beyond the strike itself. The situation would not be, in my view, materially unlike that before us. At any rate, as matters stand there is nothing plaintiffs can do for their protection. It would avail them naught, even were they willing, to designate defendant unions as the bargaining agents, since the unions expressly disavow any purpose to be so designated. Nor can plaintiffs take any step to coerce or persuade their employees to enlist themselves on the side of defendant unions in the so-called organizational campaign, lest they invade that liberty of choice in the matter which the employees are guaranteed by law, infra. Accordingly, defendants take, in truth, the only position left them, that there is simply nothing plaintiffs can do but stand by helplessly and witness the sure and accelerating process by which their business and property are being brought to destruction.
We shall deal specially with the constitutional and statutory rights that are accorded these employees, as such. But these rights are not to be forgotten in connection with the plight of the employer. An extremity of economic distress visited upon him must sooner or later create exigencies for the employees that cannot help but create the like distress for them and militate against the free exercise of their lawful rights and the protection of their lawful immunities.
Juridically, a most pertinent question must be answered. Can a campaign to organize employees be maintained without bounds, with unlimited duration and apart from a pertinent rule of reason respecting injury to the employees, who in the nature of things are dependent upon the court *47 for their protection? Here we have some 60-odd persons, textile workers and "teamsters," who daily attend their work in a small compact plant, where the pickets are and have been maintaining their vigilance continuously since last November, nine months ago. Defendants do not deny that anything fairly to be called a campaign to organize these workers is and has been at a standstill. In the course of the argument made by their attorney at the last court hearing, he declared: "We will admit that we do not get any reception from these girls." The only reason thrown out as ground for this resistance is based on outright hearsay, but there is nothing in the nature of this controversy that dispenses with the rules of evidence.
The situation respecting the non-textile employees is even more extreme. The persons who by the nature of their work would be eligible for membership in the teamsters' union are, as already stated, normally one, and never more than three. Each of these persons appeared as a witness in the hearing and testified on oath that he wanted no membership in either one of the defendant unions. There is nothing to show that there has been any change in their attitude. Indeed, the only effort to organize the "teamster" employees, to give them a designation, is described by them as the offering by defendants of money advantage which, if true, would amount to attempted bribery. All imputations of this sort, it should be added, the defendants deny. Nevertheless, there appears to be no question but that as to all the workers in both classes alike the claim that they are the subject of an organizational campaign is now a pretense and nothing more. And since there is no organizational drive in any true sense of the word, it follows that the legend borne on the pickets' signs is manifestly false and deceptive, whether intentionally or not.
On the divers aspects of our problem the cases are numerous. There would be no purpose in citing more than may be needful to establish the several points. Busch & Sons, Inc., v. Retail Union of N.J., Local No. 108, 27 N.J. *48 Super. 432 (App. Div. 1953), was reversed, but on a ground that leaves unimpaired the holding that "picketing must be in furtherance of or to accomplish a lawful labor objective" (cases cited); and that "unlawful picketing is not saved from restraint by the Anti-Injunction Act," citing among others Cordey China Co. v. United Mine Workers, 25 N.J. Super. 514 (Ch. Div. 1953).
For clear and cogent pronouncement on activities professed to be leveled at a persuasion of employees but actually to the destruction of the employer's business see S. & H. Grossinger, Inc., v. Burke, 124 N.Y.S.2d 40 (Sup. Ct. 1953) and cases cited; also Kleet v. O'Rourke, 124 N.Y.S.2d 603 (Sup. Ct. 1953); Bickford's, Inc., v. Mesevich, 107 N.Y.S.2d 369 (Sup. Ct. 1952); Saperstein v. Rich, 202 Misc. 923, 114 N.Y.S.2d 779 (Sup. Ct. 1952).
Picketing that is illegal in character or done for an illegal objective is not protected by the doctrine of free speech. See Busch & Sons, Inc., v. Retail Union of N.J., Local No. 108, and Cordey China Co. v. United Mine Workers, supra, and cases cited, including Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949). And picketing not for a legal objective within the provisions of the labor law is not protected by the anti-injunction statute of this State. Outdoor Sports Corp. v. A.F.L., etc., 6 N.J. 217, 229 (1951); Opera on Tour, Inc., v. Weber, 285 N.Y. 348, 34 N.E.2d 349, 136 A.L.R. 267 (Ct. App. 1941); American Guild of Musical Artists, Inc., v. Petrillo, 286 N.Y. 226, 36 N.E.2d 123 (Ct. App. 1941); G.H. & E. Freydberg, Inc., v. International Ladies Garment Workers Union, 128 N.Y.S.2d 470 (Sup. Ct. 1954).
It appears to be a thoroughly established doctrine that where there is a genuine question of majority representation by a named union, pressure upon the employer to induce a contract with such union is an unfair labor practice. See International Harvester Co., 87 N.L.R.B. 1123 (1949); Lift Trucks, Inc., 75 N.L.R.B. 998 (1948). In keeping with these holdings is the New Jersey case of Cordey China *49 Co. v. United Mine Workers, etc., supra; and also decisions of the New York Supreme Court in the cases following: Goodwins, Inc., v. Hagedorn, 303 N.Y. 300, 101 N.E.2d 697, 32 A.L.R.2d 1019 (Ct. App. 1951); Florsheim Shoe Store Co. v. Retail Shoe Salesmen's Union, 288 N.Y. 188, 42 N.E.2d 480 (Ct. App. 1942); Chic Maid Hat Mfg. Co. v. Korba, 281 App. Div. 1004, 121 N.Y.S.2d 354 (App. Div. 1953).
Now, in this struggle between the defendants and the employer for the organizing of the employees, what is the status of the employees? Outstanding rights and immunities which the law vests in them are involved. The design to make "labor combat free," as stated by the United States Supreme Court in the Garner opinion, infra, cannot be divorced from the concommitant necessity of keeping the combat at the same time lawful. The "freedom of labor to use the weapon of picketing" mentioned in the Garner case [346 U.S. 485, 74 S.Ct. 171] must be coordinate with and not paramount to the right of the employees to be protected against the abuse of that freedom. On any other basis the employees' freedom of choice is a fiction. Absolute equation here is essential to prevent the infliction of intolerable economic stress upon the employees through the medium of the like infliction upon the employer.
Section 7, to which section 8(a) (I) of the Labor Management Relations Act of 1947 refers, reads as follows (italics supplied):
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158 (a) (3) of this title." (29 U.S.C.A. § 157)
Article 1, par. 19 of the New Jersey State Constitution provides (italics supplied):
*50 "Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing."
Plaintiffs' employees voted only three months ago, in an N.L.R.B. election, against any organized representation at all.
The cases that sustain the right of picketing notwithstanding the absence of dispute between employer and employee belong to an earlier phase of the law and must be read anew in the light of the particular circumstances and of the right of employees to freedom of choice in the selection of bargaining representatives under the constitutional and statutory provisions quoted above. Cases of that kind are (all of them cited by defendants): Cameron v. International, etc., Union No. 384, 118 N.J. Eq. 11, 25, (E. & A. 1935); Kingston Trap Rock Co. v. International, etc., Local No. 825, 129 N.J. Eq. 570, 581, 583 (E. & A. 1941); Bayonne Textile Corp. v. American, etc., Silk Workers, 116 N.J. Eq. 146 (E. & A. 1934); Heine's, Inc., v. Truck Drivers, 129 N.J. Eq. 308 (E. & A. 1941).
I find, moreover, that illegality is so enmeshed in the general activities of these defendants that the principle enunciated by the United States Supreme Court in Milk Wagon Drivers' Union of Chicago v. Meadowmoor Dairies, Inc., 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941), is clearly applicable. True, in that case there was a good deal of external, dramatic violence that we do not have in the present instance, and it is on the ground of that difference that counsel for defendants would distinguish the Meadowmoor decision. But the phenomenon of external violence is utterly misleading. We are here concerned not with the means and methods of inflicting damage but with a course of conduct that must inevitably bring about an oppressively ruinous result. The contemplation of quiet means related *51 to destructive ends brings to mind, as an illustration, the silent, impalpable ravaging assaults of germ warfare. Plaintiffs charge that defendants are engaged in a deliberate, calculated destruction of their business and property. If that charge is true, whatever the means may be, the Meadowmoor doctrine, in my opinion, applies. It is of no moment whether a business property is destroyed by physical demolition or by the gangrenous shutting off of the commercial fluxions by which alone the property can have life and value.
Somewhat out of its logical order, we come to the question of jurisdiction. Defendants challenge the authority of this court to deal with the facts before it. For support of the challenge they rely on Garner v. Teamsters, C. & H. Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953). The general import of the latter case is that where the employer is engaged in interstate commerce an issue within the purview of the Labor Management Relations Act results and falls exclusively within the jurisdiction of the National Labor Relations Board, save under particular circumstances which do not presently concern us. In the Garner case the employer took no step toward presenting the issue to the federal authority. In the present case, on the other hand, these plaintiffs petitioned the federal authority to exercise its jurisdiction and upon the ruling by the Regional Director in denying the petition, appealed to the General Counsel with the same result. I deem that to be a vital distinction between the two cases. These defendants rely secondarily on our own Supreme Court decision in Busch & Sons, Inc., v. Retail Union of N.J., Local No. 108, 15 N.J. 226 (1954), reversing the case of the same title, supra. I think there is nothing in the latter result that can be taken to support a denial of the jurisdiction of this court in the present instance, but that, on the contrary, it reconciles that jurisdiction with the holding of the Garner opinion. The following passages in this regard from the opinion in the last cited Busch case unquestionably are significant (italics supplied):
*52 "The high court held that this constituted coercion upon employees through the medium of the employer in violation of section 8 (b) of the Taft-Hartley Act and was conduct primarily cognizable by the National Labor Relations Board, precluding state power in the premises, there being no showing that the federal Board would decline to exercise its powers if its jurisdiction was invoked by the employer." (15 N.J. at page 233)
More especially the following (italics supplied):
The Garner opinion recognizes, therefore, that in particular cases, whether the picketing is purposed to be an activity prescribed by the Taft-Hartley Act, or if so improperly purposed, whether the Board would decline to exercise its power, may be controverted questions, and also that there might be involved an issue whether the union's plea of federal jurisdiction was frivolous and dilatory. The opinion strongly implies that state remedies need not be denied if it appears that the National Labor Relations Board would decline to exercise its powers to deal with the employer's grievance or the defendant union fails seasonably to make at least a prima facie showing that a charge by the aggrieved employer might be made the subject of a complaint of unfair labor practice by the National Labor Relations Board." (15 N.J. at page 233)
And lastly:
"It may be a matter of some difficulty in these cases to say whether the Board would decline to exercise its power when, as here, it does not affirmatively appear that the employer unsuccessfully sought to have the Board do so." (15 N.J. at page 234)
The fact remains that in the present case it does affirmatively appear that federal jurisdiction was invoked and denied.
The position taken by defendants under these circumstances is extraordinary, to say the least. They urge that since federal jurisdiction has been declined there is nothing further these plaintiffs can do. This involves a startling theory, one capable of depotentiating the state court on an entirely negative ground, viz.: refusal of the federal court to exercise an available jurisdiction. The federal authority has declined to act, so according to defendants' proposition, the state court must be prohibited from acting, and in a situation that normally is, beyond a doubt, within the state's *53 sphere of governance. It is not amiss to note also that within the theory we deal with it is a most summary and perfunctory course that leads to the federal authority's refusal to function, and which, without more, would preclude the exercise of a plenary and thoroughgoing procedure in the state for determining the truth of a matter which in its essence the state court was created to adjudge. The genius of the relation between the separate sovereign states on the one hand and the sovereign union of states on the other, forbids any such pointless theory of jurisdictional paralysis, in my opinion. Such a canon of authority would provide the fatuous creation of a jural vacuum in which the substance of evil must go absolutely uncorrected because of the formal occasion of its provenance and for no other reason.
In Hughes v. Superior Court of Cal., 339 U.S. 460, 465, 70 S.Ct. 718, 721, 94 L.Ed. 985 (1950), the court said:
"Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance."
Whether or not there is a labor dispute under the New Jersey statute is no longer a question, in view of my finding of basic illegality in what defendants are and have been doing. (Cases supra)
I find specifically that plaintiffs have established as true all the matter of proof required by N.J.S. 2A:15-53, (a), (b), (c), (d) and that the provisions of N.J.S. 2A:15-51-55, inclusive, have been complied with.
By reason of the findings and the legal conclusions hereinabove set forth, it is my opinion that plaintiffs are entitled to the relief asked for, that is to the restraint of all picketing and activities allied therewith, at or in connection with the operation by plaintiffs of their plant and business in Union City. Judgment accordingly.