E. L. KERNS Co., a New Jersey corporation, complainant-respondent,

*v.*

JOSEPH G. LANDGRAF, business representative, and INTERNATIONAL UNION OF UNITED BREWERS, FLOUR, CEREAL AND SOFT DRINK WORKERS OF AMERICA, LOCAL 26 (A. F. L.), defendants-appellants.

[Submitted May 21st, 1940—Decided December 12th, 1940.]

*Messrs. Josephson & Josephson (Mr. Louis Josephson, of counsel), for the appellants.*

*Messrs. Minton & Rogers (Mr. H. Collin Minton, Jr., of counsel), for the respondent.*

The opinion of the court was delivered by

PERSKIE, J.

This is a labor case. Appellants here, defendants below (hereinafter referred to as the Union), challenge the propriety of the permanent restraint imposed upon them by the order under review.

The facts are concededly undisputed. E. L. Kerns Co., a corporation of the state, respondent here, complainant below (hereinafter referred to as complainant), manufactures, sells and distributes soft drinks and carbonated waters. It employs some twenty-five employes. None of these employes is, nor ever has been, a member of the defendant Union, nor of any other union. There was neither a strike, nor a dispute between these employes and complainant.

The Union presented to complainant a proposed contract between itself and complainant. The terms of this contract required complainant to acknowledge and recognize the Union as the proper bargaining representative on behalf of complainant's employes. Complainant refused to sign the proffered contract. Defendants then commenced to distribute the circulars or cards (hereinafter referred to as circulars), "* * * among customers and prospective customers of complainant, and caused the said circulars to be placed in mail boxes of customers and prospective customers of complainant."

The wording on one side of the circulars was:

"To Organized Labor, Friends and Sympathizers, E. L. Kerns Beverages are non-union made. The Soft Drink Workers Local 26, of Trenton, will appreciate your patronage of soft drinks in Trenton, in union shops, by skilled labor, working under union conditions, wages and hours. I. U. of U. B. F. C. D. W. of America, Local 26."

The wording on the other side was:

"Demand beverages made by these concerns Union made, Coca Cola Bottling Company, Mercer Beverages, O. K. Bottling Co.—made in Trenton."

Neither the pleadings, nor the proofs, nor any legitimate inferences deducible therefrom warrant any suggestion that the statements on the circulars were in anywise untrue. The distribution of these circulars was made not on, nor in front of, nor adjacent to complainant's place of business, but miles away therefrom. The Union's action was free from coercion, duress, threats, force or violence; it was altogether peaceable.

In this posture of the proofs, the learned Vice-Chancellor advised the challenged order by which the Union was permanently enjoined "from circularizing, posting, publicizing, mailing, or in anywise distributing circulars * * * in any manner whatsoever, or any circulars of like and similar nature with respect to the conduct of complainant's business among patrons or customers, employes of complainant, and the public generally." The Vice-Chancellor rested the restrain upon two grounds.

1. The distribution of the circulars was without warrant or justification and, therefore, unlawful. That conclusion was based upon the premise that the circulars ask, by implication, the customers and prospective customers not to patronize the complainant, and, by further implication, the circulars give the impression that the wages, hours and working conditions of complainant's employes are less favorable than those of employes in union shops, and that complainant's business has been, and will be greatly damaged, if not completely ruined, as a result of the distribution of the circulars.

The cases of *Kitty Kelly Shoe Corp.* v. *United Retail, &c. (Court of Chancery)*, *125 N. J. Eq. 250; 5 Atl. Rep. (2d) 682*, and *Feller* v. *Local 144, International, &c., Union (Court of Errors and Appeals)*, *121 N. J. Eq. 452; 191 Atl. Rep. 111*, are cited in support of the stated grounds.

2. The complainant might, in the future, be held to be engaged in interstate commerce (although it is conceded that there is no proof of the fact), and *ergo* the proffered contract

444

might be in violation of that provision of the N. L. R. A. which grants to employes the right to choose their own bargaining representative.

*First:* We take up the second ground first. We are entirely satisfied that the order cannot be sustained on this ground. The order cannot be bottomed upon the proofless premise, namely, that some time in the distant future a court may determine that complainant's business had become interstate in its scope. It is altogether rudimentary that the propriety or impropriety of an order of court can be determined only upon the actual, proper proofs submitted and the law applicable thereto as of the day of said order.

*Second:* We take up the first ground. We do not share the view that the holding in either the cited *Kitty Kelly* or the *Feller Case* is controlling or dispositive of the case at bar. For the question requiring decision is not one concerning picketing. There is no proof, nor is the claim made, that there was a "posting" at a "station" to the end of accomplishing a result contrary to the wishes or the plans of those who control the premises or who have business or other interest there. Indeed, the acts prohibited by the challenged order do not pretend to embrace the "essentials of a fixed station, beat or patrol and the posting of a person or persons thereat in an effort to compel, by this means, a yielding to [Union's] demands." *Evening Times Printing and Publishing Co.* v. *American Newspaper Guild, 124 N. J. Eq. 71, 79, 80, 81; 199 Atl. Rep. 508.* As we have already observed, the circulars were distributed miles away from complainant's premises and in a manner altogether foreign to the adjudicated concept of picketing.

*Third:* Nor is the question requiring decision one of secondary boycotting, the purpose of which is to bring to bear a duress or coercion upon or against the customers of one, as complainant here, by threatening them, directly or indirectly, with a boycott if they persist in trading with such person. *Duplex Printing Press Co.* v. *Deering, 254 U. S. 443, \*466; 65 L. Ed. 349; Truax* v. *Corrigan, 257 U. S. 312, \*327, \*328; 66 L. Ed. 254, 260; Bayonne Textile Corp.* v. *American, &c., Silk Workers, 116 N. J. Eq. 146, 159; 172 Atl. Rep. 551.*

*Cf. The Labor Injunction (Frankfurter & Greene) 43; 32 C. J. 167 § 233,* and *32 A. L. R. 756, note 2.*

Clearly, the proofs utterly fail to support the holding that the distribution of the circulars by the Union constituted a secondary boycott. And if a recognized nomenclature is necessary or desirable judicially to describe the action of the Union, it already exists. It is characterized as a boycott in the nature of a primary boycott. Such a boycott differs radically from a secondary boycott in that it is free from coercion, duress, threat, violence or intimidation. *32 C. J. 176 § 251.* But however characterized, it is a weapon in the hands of the Union which it can use only when it is used honestly, fairly and peacefully and for the purpose of soliciting the sympathy and support of the general public to help it establish and maintain its concept of the proper relationship between employer and employee.

*Fourth:* Thus we come to the specific question before us and requiring decision. Was the Union's distribution of the circulars unwarranted, unjustified and therefore illegal? Our answer is in the negative. The Union had the right to distribute the circulars. By so doing it did not illegally trench upon any co-relative right of complainant. For, however the action of the Union may be characterized legally, we necessarily base our determination of its legality upon the proofs comprehended by its action as it is made to appear in each particular case. Thus stripped of all legal terminology, all that the Union did by distributing the circulars, in manner already stated, was to bring its commodity, if so it may be characterized, or its concept of the proper relationship between employer and employe to the buying public who had and has a real social and economic concern in the resultant consequences flowing from the laboring practices followed in complainant's factory. *Cf. Thornhill* v. *Alabama, 310 U. S. 88; 84 L. Ed. 1093; Bayonne Textile Corp.* v. *American, &c., Silk Workers, supra.*

If a merchant may freely, fairly, honestly and peacefully compete with other merchants, as is the common daily practice, "by means of advertisements in the press, (or) by circulars, or by his window display" or by radio, so a union may

in like manner, here by circulars, compete with non-union concerns for customers. Such competition violates no rule of common law or otherwise; nor does it trench upon any provision of either our State or Federal Constitution. *Cf. Senn* v. *Tile Layers, &c., Union, 301 U. S. 468, \*482; 81 L. Ed. 1229, 1238.* (For the right generally to distribute circulars see *Lovell* v. *Griffin, 303 U. S. 444; 82 L. Ed. 949; Schneider* v. *New Jersey, 308 U. S. 147; McLean* v. *Mackay, 124 N. J. Law 91; 10 Atl. Rep. (2d) 733.*) If injury results from the stated competition it is *damnum absque injuria.*

Additionally, we are of the opinion, and so hold, that, under the circumstances exhibited in the instant case, the restraint imposed constitutes an infringement of the Union's right of freedom of speech and freedom of press both under our State and Federal Constitutions, notwithstanding the fact that there was no strike nor dispute between complainant and its employes. For an analogy in principle compare *Thornhill* v. *Alabama, supra; Carlson* v. *Shasta County, California, 310 U. S. 106; 84 L. Ed. 1104.*

The decree is reversed, with costs.

RAFFERTY, J. (Dissenting.)

*One:* In the majority view it is stated: "Thus stripped of all legal terminology, all that the Union did by distributing the circulars, in manner already stated, was to bring its commodity, if so it may be characterized, or its concept of the proper relationship between employer and employe to the buying public who had and has a real social and economic concern in the resultant consequences flowing from the laboring practices followed in complainant's factory."

My point of difference with this statement is that there is nothing whatsoever before us as to "the laboring practices followed in complainant's factory," except the admitted situation that none of the employes are members of the defendant Union nor of any other union and that there is neither a strike nor a dispute of any kind existing between these employes and their employer. Nor does the circular, in terms, describe the laboring practices followed in complainant's factory, except by the innuendo that the soft drinks made in

the Kerns factory are made by labor not skilled in the industry and not working under union conditions, wages and hours. The circular, as it appears in the state of case, is made up as follows:

"TO ORGANIZED LABOR
FRIENDS and
SYMPATHIZERS
E. L. KERNS
BEVERAGES
    are
NON-UNION MADE
The Soft Drink Workers
Local 26, of Trenton, will
appreciate your PATRONAGE OF
SOFT DRINKS MADE IN TRENTON,
IN UNION SHOPS, by
*Skilled labor, working UNDER*
*UNION CONDITIONS, WAGES*
*AND HOURS.* [Italics mine.]
I. U. of U. B. F. C. S. D. W.
      OF AMERICA,
        Local 26
          (over)
          DEMAND BEVERAGES MADE
            BY THESE CONCERNS
              UNION MADE
              COCA COLA
           BOTTLING COMPANY
           MERCER BEVERAGES
        O. K. BOTTLING COMPANY
          —Made in Trenton—"

The effect of including the italicized language in the circular is to produce upon the minds of reasonable persons, construing the same in connection with other parts of the circular, the understanding that the laboring practices followed in complainant's factory are contrary to and below the labor union standards, and hence, the public is invited not to patronize Kerns products.

The right to freely publish the truth of all matters of public concern cannot be extended to mean a right, by innuendo, to publish an untruth, and thereby bring harm to the person published against. Where, as here, a comparison of labor standards is invited, it is against truth to set forth the standard

of the publisher of the circular and, by omitting from the circular the standard of the one published against, to thereby condemn him by innuendo.

*Two:* The learned court below found that:

"Complainant's business has been diminished and will be greatly diminished and irreparably damaged, if not completely destroyed, as the result of the distribution of these circulars.

"It is the obvious and necessary conclusion from the facts set forth that defendants' purpose in distributing the circulars is to diminish complainant's business in order to force complainant to sign the proposed contract with defendant.

"It seems clear that the determination in *Kitly Kelly Shoe Corp.* v. *United Retail, &c., 125 N. J. Eq. 250,* is controlling and dispositive of the present case. * * *"

It is upon this basis, as I understand it, that the court below relied upon the *Kitly Kelly Case.* The fact of damage having been found, the court was correct, it seems to me, in relying upon this authority, based as it is upon the decision of this court in *Evening Times Printing and Publishing Co.* v. *American Newspaper Guild, 124 N. J. Eq. 71* (at *p. 74*), where, citing *Scherman* v. *Stern, 93 N. J. Eq. 626,* Mr. Justice Case, speaking for this court, said, "Acts destroying a complainant's business, custom and profits do an irreparable injury and authorize the issuance of a preliminary injunction."

*Three:* It is to be noted that the distribution of circulars in this case occurred shortly after respondent refused the demand of appellants that respondent, by contract with appellant Union, acknowledge and recognize the Union as the appropriate bargaining union on behalf of the employes of respondent with respect to wages, hours and other working conditions, these employes having no relationship whatsoever with the Union. There can be no doubt but that the object of the distribution of the circulars was to compel respondent to sign this contract.

I do not understand how the Union can assume to act as the agent of these employes, nor in what manner the employes would be bound thereby. There is no evidence whatsoever that the Union was clothed with such power by those whom it assumed to represent, nor is any consent to the relationship

by the would-be principal, actual, implied or by operation of law, to be spelled out of the case. I have always understood that the relation of principal and agent, as a general proposition, arose out of agreement between the parties and the appointment of agency flowed from the principal and not *vice versa*. The effect of the majority opinion in this case, as I view it, is to put a stamp of approval on this novel procedure.

The decree appealed from should be affirmed.

*For affirmance*—PARKER, CASE, PORTER, DEAR, RAFFERTY, JJ.  5.

*For reversal*—THE CHIEF-JUSTICE, DONGES, HEHER, PERSKIE, WELLS, WOLFSKEIL, HAGUE, JJ.  7.