INDEPENDENT DAIRY WORKERS UNION OF HIGHTS-
TOWN, *ET AL.*, PLAINTIFFS-APPELLANTS, v. MILK
DRIVERS AND DAIRY EMPLOYEES LOCAL No. 680,
AFFILIATED WITH THE INTERNATIONAL BROTHER-
HOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSE-
MEN AND HELPERS OF AMERICA, AFL-CIO, *ET AL.*,
DEFENDANTS-RESPONDENTS.

Argued November 5, 1956—Decided December 17, 1956.

86

*Mr. Ernest Gross* argued the cause for the plaintiffs-appellants (*Messrs. Gross & Weissberger,* attorneys).

*Mr. Edward W. Currie* argued the cause for the defendant-respondent Decker's Dairy, Inc.

*Mr. Thomas L. Parsonnet* argued the cause for the defendants-respondents Milk Drivers and Dairy Employees Local No. 680, Richard Keber, James J. Rafferty, Lawrence McGinley, Jack Hughes, Vernon L. Van Hise, Victor H.

Van Hise, George W. Brook and Frank M. Murray (*Messrs. Parsonnet, Weitzman & Oransky,* attorneys; *Albert S. Parsonnet,* on the brief).

The opinion of the court was delivered by

BURLING, J. This appeal arises from a denial of *pendente lite* injunctive relief against peaceful picketing by the Superior Court, Chancery Division. Plaintiffs filed an appeal with the Superior Court, Appellate Division, and we certified the cause prior to a review below.

Preliminarily, the present state of the controversy should be explained. Plaintiff Independent Dairy Workers Union of Hightstown (hereinafter called the Independent Union) is composed of the employees of defendant Decker's Dairy. It sought, *inter alia,* injunctive relief against picketing of the dairy and certain of its customers by defendant Milk Drivers and Dairy Employees Local 680 (hereinafter referred to as Local 680) and a judicial recognition of its status as the "sole and exclusive bargaining representative of the employees of Decker's Dairy, Inc. for the purpose of collective bargaining." Following the filing of the complaint an order to show cause why temporary relief should not be granted pending the final hearing was issued by the trial court. The order itself contained certain *ad interim* restraints. (These, however, did not affect the picketing.) At the hearing on the order to show cause Local 680 moved to dismiss because the complaint failed to allege a factual foundation upon which relief could be granted. The order to show cause was eventually dismissed and temporary relief denied upon this motion. The *ad interim* restraints were vacated. The court's interest in the merits was apparently focused solely upon the presence or absence of violence in the picketing, and, there being none, the order was dismissed. Local 680 offered no proof. In the disposition of this appeal which stems from the motion of dismissal we must resolve the issues in a context of fact and reasonable inference most favorable to the Independent Union. *Melone v. Jersey Central Power & Light Co.,* 18 *N. J.* 163, 170 (1955).

Decker's Dairy is located in Hightstown and has been engaged in an intrastate milk business in that vicinity for nearly 30 years. It purchases milk from farmers in several New Jersey counties, processes it, and sells the products to stores, restaurants and family consumers, either through sub-dealers or on its own routes. The Dairy presently employs some 52 men, the majority of whom are route salesmen and plant employees and who constitute the individual plaintiffs.

Local 680 is a labor organization affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO. It has been engaged in activities designed to attain its goal of representing the dairy employees as their bargaining agent. The program employed to attain this wholly legitimate objective constitutes the crucial point of antagonism.

Between January and March of this year Decker's Dairy laid off five employees, Hughes, Brook, Murray, Victor and Vernon Van Hise, all individual defendants herein. (Whether these lay-offs were engendered because of the men's interest in Local 680 or for reasons of economy need not be pursued at this time. The complaint does not seek relief from picketing which might be based upon this factor; and counsel for Local 680 admitted that for purposes of the motion to dismiss, the picketing was acknowledged to be for recognition purposes as alleged by the complaint.) These men, apparently under the direction of Local 680, have engaged in peaceful picketing against Decker's Dairy and many of its customers since mid-January of this year. The signs carried by the pickets, although originally stating that the dairy was unfair to union labor, now impart the following information and request: "Decker's Dairy is not signed up with Milk Drivers and Dairy Employees Local 680 AFL-CIO. Please do not purchase Decker's Dairy Products." The lever employed here to attain the legitimate objective has been successful to an extent. The Dairy has lost customers, alleged to amount to 2,000 quarts of milk daily. So much is admitted by Local 680, its attorney remarking at

the hearing below, "We hope to persuade the public not to purchase (the dairy's) milk and I am proud to think that our picketing had that effect." Local 680 stated this was part of the "persuasive process."

On January 28, 1956 the employees of Decker's Dairy met to discuss the possibility of joining or organizing a labor union. 27 of the group voted to explore the possibility of forming an independent union, three considered membership in a nationally affiliated union the wiser course, and 17 desired to have an informal employer-employee committee handle their problems. The majority course was pursued and a committee of six men proceeded with the initial investigation. They took the matter up with an attorney and were thereafter authorized by the employees to seek the formation of an independent union. On February 21, 1956 a constitution and by-laws were adopted and officers of the Independent Union were elected. The dairy management was informed that the Independent Union had been chosen by the employees as their bargaining agent. Conferences were held between the two groups in an effort to work out a collective bargaining agreement.

All during this time the picketing had continued. The dairy management met with representatives of Local 680 who demanded the employer recognize Local 680 as the bargaining agent of the employees (which demand lacked any sanction of the employees themselves). The dairy management, most aware of the conflicting interest of the two unions, requested proof of the Independent Union that it represented a majority of the employees.

The Independent Union, in order to secure its position, requested the Honest Ballot Association, an impartial body, to poll the employees. (In passing it is to be noted that New Jersey does not have a labor relations act common in many states which provides the machinery for determining the desire of employees in the choosing of bargaining representatives. See *Blumrosen, "Labor Law"* (1956 *Survey,* 11 *Rutg. L. Rev.* 171, 209–212 (1956)). The voters were given three choices:

"I wish to be represented for purposes of collective bargaining by:

A B
INDEPENDENT DAIRY WORKERS
UNION OF HIGTSTOWN
☐
_____
Write in name of Union of
your choice

I do not wish to be represented by a union at this time.

C
NO UNION
☐
This is a secret ballot and MUST NOT BE SIGNED."

45 votes were cast, and all for the Independent Union. A further demand was then made upon Decker's Dairy to enter a collective bargaining agreement with the Independent Union. Negotiations were resumed and on April 30, 1956 a contract was drawn and later ratified by the employees.

Local 680 was notified of these events by the Independent Union and a demand was made that the picketing cease. It has continued. The Independent Union filed a complaint against Local 680 and the persons engaged in the picketing, seeking the restraint of all activities which would lend the impression that a labor dispute existed between the Dairy and Local 680 or that the dairy employees were on strike, or threatening reprisals to customers of the dairy. Additional restraint against Decker's Dairy from abrogating the agreement with the Independent Union was sought as well as against any recognition of Local 680 as bargaining agent of the employees. The court was asked to determine that the Independent Union alone enjoys the position of bargaining agent.

 The crux of the argument of Local 680 on its motion to dismiss the order to show cause and here is that the anti-injunction statute of New Jersey, *N. J. S. 2A* :15–51 *et seq.*, prohibits the granting of any relief and that the right to picket is a constitutional guarantee which may not be arrested under the factual allegations of the complaint. It is all but conceded by the Independent Union that a "labor dispute" within the meaning of *N. J. S. 2A* :15–58 exists,

but in view of the unresolved controversy over the discharge of the five employees we make no determination in this regard. Consult *Outdoor Sports Corp. v. American Federation of Labor, Local 23132,* 6 *N. J.* 217 (1951) (where the presence or absence of an employer-employee relationship in relation to the statute was discussed), and the alternative holding in *Browning King Co. of New York v. Local 195,* 34 *N. J. Super.* 13 (*App. Div.* 1955). For the purposes of this decision we assume a "labor dispute" to exist and move on to assay the real merits of the plaintiffs' contentions which are hinged upon *N. J. Const.* 1947, *Art.* I, *sec.* 19, which provides as follows:

*"Persons in private employment shall have the right to organize and bargain collectively.* Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing." (Emphasis supplied)

If the picketing involved here threatens to undermine this protection given persons in private employment by our fundamental law, the anti-injunction law creates no barrier to relief, *N. J. S.* 2A:15–51(e), and the sole remaining question would be whether the activities of Local 680 are immune from restraint by virtue of the First and Fourteenth Amendments of the Federal Constitution guaranteeing freedom of speech.

The factual recitation herein is but a development of the assumptions made by the trial court in granting the motion to dismiss. The court characterized the activities of Local 680 as "recognition picketing" and held this not to be illegal in New Jersey. Inasmuch as such a broad pronouncement cannot be approved without resort to the underlying facts (which may vary considerably in these matters) we note the factual climate assumed by the trial court:

"In order to assist you, may I say that for the purposes of this motion of Mr. Parsonnet, if I make a decision on the motion in his favor, I will assume that there were some negotiations between

Local 680 and Deckers Dairy, Inc.; there was the establishment of a corporate entity, the plaintiff; that there was this election by the Honest Ballot Association and that the result is as stated by you in the complaint; that your union is recognized by Mr. Currie's client, Deckers Dairy, Inc.; that after the May 4th, 1956 letter, Schedule B, I think, of the Complaint, the picketing continued on the part of the defendant Local 680; that as a result of the picketing, despite Mr. Parsonnet's motion to strike the testimony because it wasn't tied up, that your testimony established the efficacy and effectiveness as it was intended to be; and that your clients suffered a loss of earnings, your individual clients, the plaintiffs; that Mr. Currie's client as a result also loses business which was intended by the defendant, Local 680's action; that as I note the testimony this morning, the defendant, Local 680, through its members did picket the defendant, Deckers Dairy, Inc., and the customers of your clients, that is the route customers of your clients who are also the customers of Mr. Currie; that as a result of this picketing your clients lost money and so did Deckers Dairy, but that picketing has continued under the sign stated in your complaint and that as far as this proffered sign of Mr. Parsonnet is concerned I will only consider that in the sense that a future application will consider what sign is used."

At the very outset of the hearing on the order to show cause the attitude of the trial court was revealed to the litigants in the following words:

"I think a union may picket to try to convince the workers to change from one union to another, and I don't care if there has been an election or hasn't been an election."

Hence we have a situation where the employees of a small local business have freely exercised their right to organize and bargain through a representative of their own choosing. In the face of this a competitive union is exerting coercive economic pressure upon the employer (arbitrary in the sense that it lacks any element of rational persuasion upon the employees to change their allegiance) to force an agreement with it as representative of the employees, an agreement which the persons primarily concerned do not want and have expressly rejected. Indeed, at the oral argument below the Independent Union suggested that a further balloting be taken under the court's supervision upon a ballot framed, by the court. This in response to Local 680's complaint that

it was not notified of the prior voting. From all that appears the Independent Union and Decker's Dairy have done everything possible to satiate the desires of Local 680 except to coerce the employees into taking a course which they do not choose to tread at this particular time.

As previously suggested, there are two questions to be resolved:

1—Does the picketing involved here infringe upon any right of the employees guaranteed by *N. J. Const.* 1947, *Art.* I, *sec.* 19?

2—Is the picketing involved here immune from restraint by virtue of the constitutional right of free speech?

Local 680 takes a most unusual position in suggesting that *N. J. Const.* 1947, *Art.* I, *sec.* 19, does not recognize the right of persons in private employment to designate representatives of their own choosing even though this right is expressly bestowed upon public employees. The suggestion is made that the freedom to choose labor representatives was given to persons in public employment but deliberately denied all others.

The Research and Drafting Committee of the Committee for Constitutional Revision had suggested a provision: "Employees shall have the right to organize and to bargain collectively through representatives of their own choosing." 3 Proceedings of the *N. J. Constitutional Convention of* 1947, 383. The report and recommendations of the Committee on Rights, Privileges, Amendments and Miscellaneous Provisions altered this suggestion by striking a distinction between private and public employees, but the freedom of selecting representatives of their own choosing was retained. 2 Proceedings of the *N. J. Constitutional Convention of* 1947, 1030. In the final draft adopted by the people of this State the references to private employees and to public employees were contained in two distinct sentences, and the phrase "through representatives of their own choosing" became isolated in terms from the former category. There is nothing in the Convention proceedings, however, which would indicate that private employees were thereby intended

to enjoy fewer rights than public employees in the organization process.

Freedom of choice in selecting one's bargaining agent is the very essence of collective bargaining. *Texas and New Orleans Ry. Co. v. Brotherhood of Railway and Steamship Clerks*, 281 *U. S.* 548, 570, 50 *S. Ct.* 427, 74 *L. Ed.* 1034, 1046 (1930); *International Ass'n of Machinists, Tool and Die Makers Lodge No. 35 v. N. L. R. B.*, 311 *U. S.* 72, 79, 61 *S. Ct.* 83, 85 *L. Ed.* 50, 56 (1940); *Labor Management Relations Act of* 1947, 29 *U. S. C. A., sec.* 151. The courts of this State have recognized, at least inferentially, that *N. J. Const.* 1947, *Art.* I, *sec.* 19, guarantees this freedom of choice, *Harker v. McKissock*, 10 *N. J. Super.* 26, 40 (*App. Div.* 1950), modified on other grounds, 7 *N. J.* 323 (1951) (see *Id., at page* 334), and should we depart from this proposition the recognition given by our Constitution to private employees would be set at naught. The right is implicit in the right to organize and bargain collectively and therefore is to be accorded the same recognition as though it were expressly recited.

Here the dairy employees, from all that appears, have freely chosen their bargaining representatives. Employer recognition awaited proof that the democratic process had been followed. The present picketing is aimed at thwarting this free choice through economic duress upon the employer which has reached to the employees because of the continued loss of business.

There is a measure of support in our decisional law of New Jersey which would condone this incongruous situation. In *Newark Milk and Cream Co. v. Milk Drivers and Dairy Employees Local No. 680*, 19 *N. J. Misc.* 468 (*Ch.* 1941), much the same pattern appears. The report indicates that an independent union represented a majority of the employees and that a collective bargaining agreement negotiated by that union was in force. The defendant union engaged in peaceful picketing against the plaintiff's customers, many of whom ceased to do business with plaintiff. No strike or dispute existed between the plaintiff and its employees; the

picketing was carried on by "strangers." The precise holding of the case was that under the state anti-injunction act the picketing was lawful, although the vice-chancellor intimated that it was also protected under the doctrine of *American Federation of Labor v. Swing*, 312 *U. S.* 321, 61 *S. Ct.* 568, 85 *L. Ed.* 855 (1941). At this time, of course, we did not have our present Constitution and Article I, section 19, and the United States Supreme Court had but recently announced what had been interpreted to be a blanket equation of peaceful picketing with the right of free speech, *Thornhill v. State of Alabama*, 310 *U. S.* 88, 60 *S. Ct.* 736, 84 *L. Ed.* 1093 (1940), a point of view which our courts, see *Miller's, Inc., v. Journeyman Tailors, etc.*, 128 *N. J. Eq.* 162 (*E. & A.* 1940), reversed *per curiam* 312 *U. S.* 658, 61 *S. Ct.* 732, 85 *L. Ed.* 1106 (1941), as many others, initially accepted in its broadest scope. *Heine's, Inc., v. Truck Drivers', etc., Local No. 676*, 129 *N. J. Eq.* 308 (*E. & A.* 1941); *Feller v. Local 144, Inter'l, etc., Union*, 129 *N. J. Eq.* 421 (*E. & A.* 1941). But cf. *Van Buskirk v. Sign Painters Local No. 1231*, 127 *N. J. Eq.* 533 (*E. & A.* 1940), and comment thereon in *Ukrainian Nat'l. Home v. Local 488, etc., Union*, 139 *N. J. Eq.* 115 (*Ch.* 1946). Today these controversies must be resolved in the light of our fundamental law (*N. J. Const.* 1947, *Art.* I, *sec.* 19) and the more recent pronouncements of the high federal court.

The holding of the *Newark Milk* case based upon the anti-injunction statute was followed in *Holly Stores of Camden, Inc., v. District 76, etc., of America*, 14 *N. J. Super.* 477 (*Ch.* 1951). It is not at all clear from the brief report of the *Holly* case which competing union held the support of the employees nor that the effect of the picketing was economic duress. No mention is made of the constitutional provision now in issue and the case therefore is far from decisive.

 The holding in the *Newark Milk and Cream Co.* case cannot be supported if the protection afforded to insure unfettered organizational processes by our Constitution is to have substance. We hold that when a group of persons

in private employment have freely exercised their right to choose a bargaining representative, the will of the majority may not be undermined by picketing where the sole object is economic duress upon the employer and the employees. The determining point in the episode of events is the balloting itself, the uncoerced expression of the majority will. The protection is guaranteed against arbitrary interference by employer or competing labor organizations. Accord, *Pappas v. Stacey*, 151 *Me*. 36, 116 *A*. *2d* 497 *(Sup. Jud. Ct. 1955)*, appeal dismissed, 350 *U. S*. 870, 76 *S. Ct*. 117, 100 *L. Ed*. 770 (1955); *Bellerive Country Club v. McVey*, 284 *S. W. 2d* 492 *(Mo. Sup. Ct. 1955)*; *Goodwins, Inc., v. Hagedorn*, 303 *N. Y*. 300, 101 *N. E. 2d* 697, 32 *A. L. R. 2d* 1019 *(Ct. App. 1951)*; *Sansom House Enterprises v. Waiters and Waitresses Union*, 382 *Pa*. 476, 115 *A. 2d* 746 *(Sup. Ct. 1955)*, *certiorari* denied 350 *U. S*. 896, 76 *S. Ct*. 155, 100 *L. Ed*. 788 (1955); *Audubon Homes v. Spokane Bldg. and Construction Trades Council*, 298 *P. 2d* 1112 *(Wash. Sup. Ct. 1956)*; *Vogt, Inc., v. International Brotherhood of Teamsters*, 270 *Wis*. 315, 71 *N. W. 2d* 359 *(Sup. Ct. 1955)*, rehearing granted and decision reversed 74 *N. W. 2d* 749 (1956), *certiorari* granted 77 *S. Ct*. 31, 1 *L. Ed. 2d* 44 (1956); *cf. Cordey China Co. v. United Mine Workers, Dist. 50*, 25 *N. J. Super*. 514 *(Ch. 1953)*; *Hammer v. Local No. 211*, 34 *N. J. Super*. 34 *(Ch. 1954)*; *Sax Enterprises, Inc., v. Hotel Employees Union Local No. 255*, 80 *So. 2d* 602 *(Fla. Sup. Ct. 1955)*; *Shenker Displays, Inc., v. Goldman*, 142 *N. Y. S. 2d* 640 *(Sup. Ct. 1955)* (later dismissed for lack of state jurisdiction—144 *N. Y. S. 2d* 7). *Wood v. O'Grady*, 307 *N. Y*. 532, 122 *N. E. 2d* 386 *(Ct. App. 1954)*, *certiorari* denied 349 *U. S*. 939, 75 *S. Ct*. 784, 99 *L. Ed*. 1267 (1955), upon which Local 680 relies is not contrary to our decision here. There an injunction against stranger picketing to unionize the employees of a retail store was disallowed by a 4–3 decision of the New York Court of Appeals. There was evidence that the employer had coerced his several employees not to join the union and there was no proof of a substantial loss of patron-

age. An analysis of the majority opinion, the two concurring opinions and the dissent indicate that had there been proof of coercion upon the employer to compel his employees to join the union a restraint would have been proper. See *Koretz, "Labor Relations Law"* (1955 *Survey*), 30 *N. Y. U. L. Rev.* 1516, 1518 (1955).

 Our anti-injunction law (*N. J. S.* 2A:15–51(*e*)) forbids the issuance of an injunction, either temporary or permanent in nature, which would prohibit any person or persons from

"giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, picketing, without fraud or violence, or by any other method not involving fraud or violence, *and not in violation of any other law of the state of New Jersey.*" (Emphasis supplied)

The sole object of the picketing here, on the state of the case before us, works to violate the protection of *N. J. Const.* 1947, *Art.* I, *sec.* 19, and may therefore be enjoined.

A consideration of the decisions of the United States Supreme Court subsequent to *Thornhill v. State of Alabama, supra,* and *American Federation of Labor v. Swing, supra,* does not require us to reach a different conclusion upon the constitutional guarantee of freedom of speech, First and Fourteenth Amendments of the Federal Constitution; *Article* I, *section* 6, 1947 *New Jersey Constitution.* See *Outdoor Sports Corp. v. American Federation of Labor Local 23132, supra,* 6 *N. J.,* at *page* 231, 78 *A. 2d,* at *page* 76; *Galler v. Slurzberg,* 27 *N. J. Super.* 139, 154–157 (*App. Div.* 1953), *certiorari* denied 13 *N. J.* 391 (1953).

 On the same day that the *Swing* case was decided the high court recognized that picketing, as an incident of free speech, was not beyond restraint where violence was the prime ingredient. *Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies,* 312 *U. S.* 287, 61 *S. Ct.* 552, 85 *L. Ed.* 836 (1941). Violence or mass picketing do not constitute the basis for the constitutional guarantee envisioned by *Thornhill* [310 *U. S.* 88, 60 *S. Ct.*

744] to protect "the dissemination of information concerning the facts of a labor dispute." The constitutional protection does not extend to all instances of peaceful picketing, *Bakery and Pastry Drivers and Helpers Local 802 of International Brotherhood of Teamsters v. Wohl*, 315 *U. S.* 769, 68 *S. Ct.* 816, 86 *L. Ed.* 1178 (1942), nor even where such picketing results in concerted economic coercion to arbitrarily force unionization upon workingmen. *Giboney v. Empire Storage and Ice Co.*, 336 *U. S.* 490, 69 *S. Ct.* 684, 93 *L. Ed.* 834 (1949).

In *Building Service Employees International Union Local 262 v. Gazzam*, 339 *U. S.* 532, 70 *S. Ct.* 784, 94 *L. Ed.* 1045 (1950), a unanimous court held that picketing which sought to coerce an employer into compelling his employees to join the picketing unions could be enjoined where it violated the public policy of the state. The employer had refused to sign a contract with the union which would have required his employees to join the organization. He took the position that this was their decision. Union representatives met with the employee group and sought through the means of persuasive argument to gain their support and approval. A ballot was then taken and the majority voted against joining the union. Peaceful picketing then ensued with signs stating the employer was unfair to organized labor. The state court issued an injunction upon complaint by the employer enjoining the union "from endeavoring to compel (the employer) to coerce his employees to join the defendant union or to designate defendant union as their representative for collective bargaining * * *." This injunction was upheld by the Supreme Court, and Mr. Justice Minton used these significant words:

"Here, as in Giboney, the union was using its economic power with that of its allies to compel respondent to abide by union policy rather than by the declared policy of the state. That State policy guarantees workers free choice of representatives for bargaining purposes. If respondent had complied with petitioners' demands and had signed one of the tendered contracts and lived up to its terms, he would have thereby coerced his employees. The employees would

have had no free choice as to whether they wished to organize or what union would be their representative.

The public policy of Washington relied upon by the courts below to sustain this injunction is an important and widely accepted one. The broad purpose of the Act from which this policy flows was to prevent unreasonable judicial interference with legitimate objectives of workers. But abuse by workers or organizations of workers of the declared public policy of such an Act is no more to be condoned than violation of prohibitions against judicial interference with certain activities of workers. We therefore find no unwarranted restraint of picketing here. The injunction granted was tailored to prevent a specific violation of an important state law. The decree was limited to the wrong being perpetrated, namely, 'an abusive exercise of the right to picket.' " 339 *U. S.*, at *pages* 540, 541, 70 *S. Ct.*, at *pages* 788, 789, 94 *L. Ed.*, at *page* 1052.

The opinion noted, however, that the statute which had been construed by the Washington Supreme Court (see *Gazzam v. Building Employees International Union*, 29 *Wash. 2d* 488, 188 *P. 2d* 97 and 34 *Wash. 2d* 38, 207 *P. 2d* 699) had been interpreted to prohibit "coercion of workers by employers" and, by inference, not to preclude "picketing of workers by other workers." We do not understand this observation to mean that picketing causing economic duress is constitutionally protected when it is ostensibly aimed at the employees rather than the employer, and the employees have already freely exercised their right under our State Constitution to choose their bargaining representative. Such an interpretation would be unrealistic in that all picketing which brings about economic coercion hits the employer in the first instance. See *Audubon Homes v. Spokane Bldg. and Construction Trades Council, supra; Rains, "The Current Status of Organizational or Recognition Picketing,"* 7 *Labor Law J.* 539 (1956) ; *Petro, "Free Speech and Organizational Picketing in* 1952," 4 *Labor Law J.* 3 (1953) ; Note, 53 *Mich. L. Rev.* 1006 (1955). See, generally, *Tanenhaus, "Picketing—Free Speech: The Growth of the New Law of Picketing from* 1940 *to* 1952," 38 *Cornell L. Q.* 1 (1952) ; *Lauritzen (contra)* and *Tobriner (pro), "The Organizational Picket Line,"* 3 *Stanford L. Rev.* 413, and 423 (1951) ; *Rose, "Limitations on the Power of States to Enjoin Picketing,"* 41 *Va. L. Rev.* 581 (1955) ; *Smoot,*

*"Stranger Picketing: Permanent Injunction or Permanent Litigation?,"* 42 *A. B. A. J.* 817 (1956). The orbit of protection under the doctrine of free speech, in our view, encompasses nothing more than fair and rational persuasion.

 Here the sole object of the picketing was economic duress calculated to deprive the employees of the choice they had unanimously made, using the employer as the activating force. The hope of impairing the Dairy's business has succeeded but the employer and employees have resisted the intended ramifications. The object of the picketing seeks to undermine the right of the plaintiff employees to freely select a bargaining agent—a right which has been exercised. Because the object of the picketing is antagonistic to our public policy as pronounced in *N. J. Const.* 1947, *Art.* I, *sec.* 19, and because it is not immune from prohibition under the First and Fourteenth Amendments of the Federal Constitution, temporary restraints pending final hearing will be issued upon remand to the extent necessary to remove the unlawful features of the activity. The case may then proceed to final hearing in order to develop the full factual background and especially the charge, unsupported by any proof before us, that the Independent Union is a management product.

While the decision in this case is grounded upon substantive law it is not improper to visualize the immediate consequences to a group of employees on the one hand and a national labor union on the other if the instant picketing were allowed to continue pending final hearing. This would result in a continued loss of business, wages and potential loss of employment itself. Yet what harm can come to the competing labor union if *ad interim* restraints are imposed to remove the coercive economic effect of the picketing? It will not preclude Local 680 from pursuing its objective through fair and rational persuasion. Even in situations where the anti-injunction act is clearly applicable these are proper points of consideration. See *N. J. S.* 2A:15–53(c).

The cause is reversed and remanded to the Superior Court, Chancery Division, for the purpose of awarding temporary

injunctive relief to the extent necessary to remove the coercive economic effect of the picketing and to proceed on to a final hearing.

HEHER, J. (dissenting). *N. J. S.* 2*A*:15–51 forbids the issuance of "any restraining order or interlocutory or permanent injunction" against the "doing, whether singly or in concert," of certain acts, this among others: "Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, picketing, without fraud or violence, or by any other method not involving fraud or violence, and not in violation of any other law of the state of New Jersey," affirmed "to be lawful and in no wise to constitute a tort or a nuisance."

And it is also declared to be the "public policy" of the State, "(i)n the interpretation and application" of the Article, *N. J. S.* 2*A*:15–52, that the procedure permitting a complaining party "to obtain in any case involving or growing out of a labor dispute," as therein defined, "sweeping injunctive relief that is not preceded by or conditioned upon notice to and hearing of the responding party or parties, or that issues after hearing based upon written affidavits alone and not wholly or in part upon examination, confrontation and cross-examination of witnesses in open court, is subject to abuse and contrary to the public policy" of the State, for reasons therein enumerated.

*N. J. S.* 2*A*:15–53 bars the allowance of a temporary or permanent injunction "in any case involving or growing out of a labor dispute," as therein defined, "except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings" (a) of the commission of "unlawful acts," likely to be continued unless restrained; (b) substantial and irreparable injury to plaintiff's property unless relief is granted; (c) as to "each item of relief granted," a showing of "greater injury" to the plaintiff by the denial of relief than to the

defendants "by the granting thereof;" and (d) the want of an adequate remedy at law. As to the findings of fact made a pre-condition to the issuance of an injunction, see *N. J. S.* 2*A* :15–55.

And "A case shall be held to involve or to grow out of a labor dispute," *N. J. S.* 2*A* :15–58(*a*), when it "involves persons who are engaged in industry, trade, craft, employment, or occupation; or who are members of an affiliated organization of employers or employees; whether such dispute is (1) between 1 or more employees and 1 or more employers; (2) between 1 or more employees and an association or associations of employees or employers; (3) between an association or associations of employees and any other association or associations of employees * * *; or (4) when the case involves any conflicting or competing interests in a 'labor dispute,'" as therein defined, "of 'persons participating or interested' therein," as so defined. A person or association, *N. J. S.* 2*A* :15–58(*b*), shall be held to be a person "participating or interested in a labor dispute" if "relief is sought against him or it, and if he or it is engaged in the industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association of employers or employees engaged in such industry, trade, craft, or occupation."

The term "labor dispute" is defined to include, *N. J. S.* 2*A* :15–58(*c*), "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

For the significance of the statute, see *Westinghouse Electric Corporation v. United Electrical, Radio and Machine*

*Workers of America, Local No. 410,* 139 *N. J. Eq.* 97 (*E. & A.* 1946).

There can be no doubt of the existence here of a "labor dispute" within the intendment of the statute. My brethren say: "It is all but conceded by the Independent Union that a 'labor dispute,'" as so defined, "exists, but in view of the unresolved controversy over the discharge of the five employees we make no determination in this regard." These men were dismissed following their admission into the defendant union; and the company union then came into being under circumstances suggestive of a company-impelled and company-dominated union to forestall the organization of their employees by the defendant union and therefore calling for a plenary inquiry in the statutory mode as to the workers' exercise of free choice, not to mention the right to picket for the reinstatement of those discharged from their employment after joining the defendant union, a "controversy * * * concerning the association or representation of persons in negotiating * * * terms or conditions of employment," and between associations and employees under *N. J. S.* 2*A*:15–58(*a*) that constitutes a "labor dispute" within the definition of *N. J. S.* 2*A*:15–58(*c*). Compare *Mastro Plastics Corporation v. National Labor Relations Board,* 350 *U. S.* 270, 76 *S. Ct.* 349, 100 *L. Ed.* 309 (1956).

This court now finds that the "sole object of the picketing was economic duress calculated to deprive the employees of the choice they had unanimously made, using the employer as the activating force," to "undermine the right of the plaintiff employees to freely select a bargaining agent—a right which has been exercised," and thus "antagonistic to our public policy as pronounced in" *Article* I, *paragraph* 19 of the 1947 State Constitution, and so may be enjoined. And then there is a remand of the cause for "final hearing in order to develop the full factual background and especially the charge, unsupported by any proof before us, that the Independent Union is a management product."

There is no conflict between the Constitution and the pre-existing statute. The constitutional guarantee is the embodiment in the organic law, proof against legislative interference, of a principle and rule of conduct of general acceptance, that persons in private employment are free to organize and bargain collectively and to take collective action for the individual and common good not inconsistent with the public interest, nor hurtful to the public order, nor detrimental to the common good. *Bayonne Textile Corporation v. American Federation of Silk Workers*, 116 *N. J. Eq.* 146 (*E. & A.* 1934); *Kingston Trap Rock Co. v. International Union of Operating Engineers, Local No. 825*, 129 *N. J. Eq.* 570 (*E. & A.* 1941).

This constitutional provision secures to "persons in private employment" the "right to organize and bargain collectively," and to "persons in public employment" the "right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals, through representatives of their own choosing."

The right of persons in private employment to organize and bargain collectively through representatives of their own free choice is of the very essence of the constitutional protection; and coercion may not be employed to subvert this basic freedom of persons so employed to select their own bargaining representatives, and, by such means, to fulfill the right of labor to organize for the betterment of wage, hour and working conditions, whether the compulsion be exerted directly upon the employees themselves or indirectly through the employer, or by the employer himself to his own ends. This would seem to be axiomatic. What constitutes coercion erosive of free agency, as distinct from fair persuasion, is another question, involving also the right to picket in the just pursuit of the common and individual interest.

In the field of interstate action, the National Labor Relations Board has uniformly taken the position that stranger picketing does not transgress the National Labor Relations Act, although, contrariwise, there is adherence in

some quarters to the philosophic concept that stranger picketing in its very nature involves unlawful economic coercion of employee free choice in regard to bargaining representation. See *"Labor Relations Law,"* by Professor Petro, 1955 *Annual Survey of American Law,* 199 (New York University School of Law).

Counsel for the defendant Local No. 680 finds determining significance in the omission, from the specific constitutional guarantee accorded to persons in private employment, of the phrase "through representatives of their own choosing" included in terms in the protection given to persons in public employment. And the union asserts a "right to picket" as "an incident to the constitutional guarantee of freedom of speech" under *Article* I, *section* 6 of the 1947 *New Jersey Constitution* and the First and Fourteenth Amendments to the Federal Constitution, citing *E. L. Kerns Co. v. Landgraf,* 128 *N. J. Eq.* 441 (*E. & A.* 1940); *Newark Milk and Cream Co. v. Milk Drivers and Dairy Employees Local 680,* 19 *N. J. Misc.* 468 (*Ch.* 1941); *Bayonne Textile Corporation v. American Federation of Silk Workers, supra; Thornhill v. State of Alabama,* 310 *U. S.* 88, 60 *S. Ct.* 736, 84 *L. Ed.* 1093 (1940).

Acknowledging that under *Building Service Employees International Union, Local 262 v. Gazzam,* 339 *U. S.* 532, 70 *S. Ct.* 784, 94 *L. Ed.* 1045 (1950), the "right to picket must fall before a proper public policy of the state, established either judicially or legislatively," and "If, under the State's public policy, the object of the picketing is unlawful, it may be prohibited," the insistence is that the "picketing in this case is utterly lawful," and "no proper public policy could be established to declare that its objects are unlawful"; that "even if the picketing were solely and exclusively for recognition, our State's policy does not stand in the way," citing *Newark Milk and Cream Co. v. Milk Drivers and Dairy Employees Local No. 680, supra; Holly Stores of Camden v. District 76, Distributive Processing & Office Workers of America,* 14 *N. J. Super.* 447 (*Ch. Div.* 1951); that New Jersey does not have a "Labor Relations Act

which would enable the parties to secure a formal certification, and would enable us to charge, prove, and thereby secure the disestablishment of the company union on the ground that it is dominated by the company"; that the design here is "to pervert the provision" of the 1947 State Constitution "to their ends, to assert constitutional protection for an employee-representation plan, even though it may be thoroughly company dominated"; that the "Wagner Act, the Taft-Hartley Law, and all of the State Labor Relations Acts have specific prohibitions against the creation of company-dominated unions," and in New York, "notwithstanding a constitutional provision guaranteeing to employees 'the right to organize and to bargain collectively through representatives of *their own choosing,'*" *New York Constitution, Article* I, *section* 17, "the Labor Relations Act prohibits and requires the disestablishment of company dominated unions," *New York State Labor Relations Law, Article* 20, *section* 704, *paragraph* 3, adopted 1937, *c.* 443; yet here the contention is that the cited article of the 1947 New Jersey Constitution "would prevent the disestablishment of a company-dominated union."

The "omission" of the express provision for representation of persons in private employment is thus explained: This State constitutional guarantee "was intended to cover only employees not protected by the Federal Act," "not factory employees, transportation employees, or other interstate workers," but rather "in the main, employees in the building and construction industries, and other similar types of craftsmen," in a field where "it is and always has been the practice of building contractors of all sorts to sign a union contract before they employ their craftsmen," and "In this way, they can call upon the union of the particular craft whenever they want to, and procure the necessary mechanics," a "type of contract" that "has always been frowned upon by the" N. L. R. B., "since it does not allow the ultimate employees the opportunity of designating representatives of their own choosing," citing *Douds v. Anheuser-Busch, Inc.,* 99 *F. Supp.* 474 (*D. C. N. J.* 1951), where

the company and union were restrained "from effectuating a contract signed before the employment of the employees to be covered, based upon the guarantee of 'representatives of their own choosing,' " and "To avoid a similar effect in this State, which would force a change in the labor practices of the largest segment of intrastate industry, the building trades, the phrase 'through representatives of their own choosing' was carefully, consciously and deliberately omitted in the portion of the constitution relating to private employees"; and, moreover, under the doctrine of the then decided *Florsheim Shoe Store Co., v. Retail Shoe Salesmen's Union,* 288 *N. Y.* 188, 42 *N. E.* 2*d* 480 (*Ct. App.* 1942), "If these words had been included in the 'private employees' ' clause, company-dominated unions could seize upon them, as our adversaries are attempting to do, in order to enjoin picketing even though there was no State Labor Relations Act which could bar company-dominated unions or determine formally and efficiently the uncoerced desires of a majority of employees in an 'appropriate unit' for collective bargaining," a determination by the Board under a Labor Relations Act, *e. g.,* "a craft unit, in which case the majority of the craft would determine the question," a "departmental unit, a plant-wide unit, a company-wide unit, or even an industry-area-wide unit," such as "exists, under the NLRB, in the milk industry in northern New Jersey."

The adjudications of the New York courts interdicting recognition picketing had their genesis in the policy of the cases in the United States Supreme Court commencing with *Giboney v. Empire Storage & Ice Co.,* 336 *U. S.* 490, 69 *S. Ct.* 684, 93 *L. Ed.* 834 (1949), holding eventually that the constitutional protection of free speech did not insulate peaceful picketing against injunctive restraint under all circumstances. Picketing designed to effect the "coercion by the employer of the employee's selection of a bargaining representative" could be enjoined. *Building Service Employees International Union, Local 262 v. Gazzam,* cited *supra; International Brotherhood of Electrical Workers Local 501, A. F. of L. v. National Labor Relations Board,*

341 *U. S.* 694, 71 *S. Ct.* 954, 95 *L. Ed.* 1299 (1951); *Local Union No. 10, United Ass'n of Journeymen Plumbers and Steamfitters of United States and Canada of A. F. L. v. Graham,* 345 *U. S.* 192, 73 *S. Ct.* 585, 97 *L. Ed.* 946 (1953), decisions diverging from the earlier causes of *Thornhill v. State of Alabama,* cited *supra; American Federation of Labor v. Swing,* 312 *U. S.* 321, 61 *S. Ct.* 568, 85 *L. Ed.* 855 (1941), rehearing denied 312 *U. S.* 715, 61 *S. Ct.* 735, 85 *L. Ed.* 1145 (1941); *Cafeteria Employees Union Local 302 v. Angelos,* 320 *U. S.* 293, 64 *S. Ct.* 126, 88 *L. Ed.* 58 (1943). See *"Organizational and Recognition Picketing,"* by David L. Benetar, *Eighth Annual Conference on Labor* (New York University, 1955), *p.* 199.

In the later case of *Wood v. O'Grady,* 307 *N. Y.* 532, 122 *N. E. 2d* 386 (*Ct. App.* 1954), the New York Court of Appeals, dividing four to three, held that peaceful organization picketing concerns a "labor dispute" as defined in section 876–a of the New York Civil Practice Act. *L.* 1935, *c.* 477. Injunctive relief was denied, generally for the reasons that the picketing was not designed to exert economic pressure on the employer, but rather to enlist the support of the employees in the unionization program, and the coercion involved was directed by the employer against the employees and not by the union against the employer, and there was no showing of irreparable injury.

The labor policy embodied in the New York Civil Practice Act is much the same as ours. There may be peaceful picketing without fraud or violence for the publicizing of a "labor dispute" as there defined, concerning "terms or conditions of employment * * * or representation * * * employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the relation of employer and employee." *Subd.* 10, *par.* (*c*). The New York act applies even though the disputants do not stand in the relation of employer and employee, *May's Furs and Ready to Wear, Inc., v. Bauer,* 282 *N. Y.* 331, 26 *N. E. 2d* 279 (*Ct. App.* 1940), and if the acts of the union

"have any reasonable connection with wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment or for the protection from labor abuses, then the acts are justified," *Opera on Tour, Inc., v. Weber,* 285 *N. Y.* 348, 355, 34 *N. E. 2d* 349, 352, 136 *A. L. R.* 267 (*Ct. App.* 1941), and "inconvenience to the employer" without more cannot be labeled "an unlawful objective," but merely the "consequences frequently accompanying peaceful picketing in a labor dispute," *Wood v. O'Grady, supra,* in the pursuit of an organizational activity in keeping with the policy of the statute.

The holding in *Wood v. O'Grady* was that "It is only when the picketing is unlawful that it may properly be restrained," and there is nothing in the statute "authorizing the use of an injunction in peaceful picketing for avowedly organizational purposes." And *Goodwins, Inc., v. Hagedorn,* 303 *N. Y.* 300, 101 *N. E. 2d* 697, 32 *A. L. R. 2d* 1019 (*Ct. App.* 1951), was there distinguished as concerned with "picketing to compel employer recognition as collective bargaining agent of its workers, despite the fact that a certification proceeding on that very issue was pending before the National Labor Relations Board to determine whether the picketing union or a rival union should be certified, a quite different situation."

Judge Dye said:

"It is axiomatic that we may not, under the guise of interpretation, import into a statute conditions or criteria which the Legislature has been careful to omit. By the same token, we may not review a record in such a way as to bypass the clear meaning and intent of the Legislature. If the Legislature wishes to sound the death knell of peaceful organizational picketing by repealing *section* 876–a as a declaration of State policy, or by amending it, so as to permit the restraint of peaceful organizational picketing as unlawful because 'exerting economic pressure' in addition to that presently defined as 'substantial and irreparable injury to complainant's property' it, of course, may do so but we may not."

And Judge Dye rejected the thesis that lengthy picketing "without success," in that case for 18 months, constituted "unlawful economic coercion," holding that the "test of

illegality * * * is not whether any particular picketing has 'gone on long enough' but rather whether such picketing is being lawfully conducted in the furtherance of union interests in a statutory labor dispute," for section 876–a "prescribes no time limit" where "picketing is a legally protected right."

Full freedom in the selection of bargaining representatives is an essential attribute of the constitutional mandate; and no inference of a different policy is derivable from the omission of an express provision for representation. We are not referred to the deliberations of the 1947 Constitutional Convention or its committee proceedings as in any wise giving color to the distinction offered by counsel. There is implicit in this basic guarantee freedom of association, self-organization, and of representation in the marketing of the workers' services. But New Jersey's broad policy in this controversial field involving fundamental social and economic relations, expressed in the Anti-Injunction Act, is to be fulfilled in consonance with the manifest reason and spirit of the expression. Such is the philosophy of *Gazzam, supra,* holding that the right of free speech as guaranteed by the Fourteenth Amendment is not violated by state policy forbidding employers to coerce their employees' choice of representatives for purposes of collective bargaining. It was there said that, as in *Giboney, supra,* "the union was using its economic power with that of its allies to compel respondent to abide by union policy rather than by the declared policy of the state." See *American Federation of Labor v. Swing, supra.*

And it does not matter that the picketing enjoined may be outside the scope of the state anti-injunction act. The right to picket does not depend upon the local definition of a labor dispute. *Bakery and Pastry Drivers and Helpers Local 802 of International Brotherhood of Teamsters v. Wohl,* 315 *U. S.* 769, 62 *S. Ct.* 816, 86 *L. Ed.* 1178 (1942) ; *Cafeteria Employees Union Local 302 v. Angelos, supra.* State law as to the "legitimate area of the labor dispute is thus not controlling on the right to enjoin or criminally punish

peaceful picketing." *"Labor Relations Law,"* by Marcus Manoff, *American Law Institute* (December 1955), *p.* 113.

Most if not all of the several state labor relations acts, and the federal act also, provide for administrative review of the certification of "company" unions and their disestablishment as well where the association was unduly coerced or for other good cause. We have no such mechanism in New Jersey; and where, as here, the right to picket is challenged as a measure designed to coerce the employer's breach of a collective-bargaining agreement made with a company union, the union's establishment as a free association comporting with the constitutional guarantee would in principle be a pre-condition to the exercise of the injunctive power.

And it is generally the province of union labor to take reasonable measures to maintain its bargaining position within the industry, by meeting market competition arising from the lower standards of non-union establishments; and to make its cause known to the public with a view of public support by peaceful means devoid of force and violence, fraud and misrepresentation and the elements of unreason in mode and manner, such as distinguishes "coercion" from fair persuasion. *Kingston Trap Rock Co. v. International Union of Operating Engineers, Local No. 825, supra.* See *"Labor Relations Law,"* Manoff, *supra, p.* 114 *et seq.* This is an inquiry that is sometimes said to be concerned with the difference between purely organizational picketing, *i. e.,* to persuade the employees to join the union and inform the public that they are not in the union, and recognition picketing, where the union seeks "to compel the employer to compel the employees to join the union" and to inform the public of the employer's failure to comply with the demand, a distinction that has been criticized as arbitrary and meaningless. See *"Organizational and Recognition Picketing,"* by Stephen V. Vladeck, *Eighth Annual Conference on Labor* (New York University, 1955), *p.* 207.

Here, we do not have a bargaining representative certified by an authorized administrative agency; and there has been

no prior inquiry and determination of representation in the manner provided by the statute for the resolution of issues upon which the right to an injunction depends. Indeed, our statute does not so condition the secured right to picket; and a state policy of peaceful picketing in the service of the common interest of the workers in the same industry, directed to the betterment of their wage and working conditions, does not trample upon the basic rights of the employers. *Kingston Trap Rock Co. v. International Union of Operating Engineers, Local No. 825, supra.*

Here, there was no mass picketing, no violence or threat of violence, or fraud or misrepresentation. And 'the means of communication are always subject to reasonable control, to preclude abuse of the right.

I would affirm the order refusing an injunction.

JACOBS, J. (dissenting). I agree with Justice HEHER that the particular circumstances presented call for a full hearing in the Chancery Division and that in the meantime no preliminary injunction should issue. Since that was the effect of the order appealed from, I vote to affirm.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD and BURLING—4.

*For affirmance*—Justices HEHER and JACOBS—2.